**RAY INDUSTRIES, INC., Plaintiff–Appellee, Cross–Appellant,**

v.

**LIBERTY MUTUAL INSURANCE COMPANY, Defendant–Appellant, Cross–Appellee.**

Nos. 90–2152, 90–2220.

United States Court of Appeals, Sixth Circuit.

Argued May 15, 1992.

Decided Sept. 10, 1992.

Rehearing and Rehearing En Banc Denied Oct. 27, 1992.

Darlene Domanik (briefed), Kurtis T. Wilder, Robert C. Davis, Jack D. Shumate (argued), Butzel, Long, Gust, Klein & Van Zile, Detroit, Mich., Henry G. Kolb, Skokie, Ill., for Ray Industries, Inc.

Sandra A. Prokopp, Beresh & Prokopp, Novi, Mich., Lee H. Glickenhaus (argued and briefed), Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, Boston, Mass., for Liberty Mut. Ins. Co.

Laura A. Foggan (briefed), Carol Barthel, Thomas W. Brunner, Wiley, Rein & Fielding, Washington, D.C., Insurance Environmental Litigation Ass'n, amicus curiae.

William F. Greaney, and Curtis A. Bradley (briefed), Covington & Burling, Washington, D.C., American Petroleum Institute amicus curiae, American Fiber Manufacturers Ass'n, amicus curiae, Chemical Manufacturers Ass'n, amicus curiae, International Business Machine Corp., amicus curiae, Olin Corp., amicus curiae.

Before: RYAN, BOGGS, and BATCHELDER, Circuit Judges.

BOGGS, Circuit Judge.

Under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA), 42 U.S.C. §§ 9601 *et seq.*, the Environmental Protection Agency may notify "potentially responsible parties" (PRPs) that they may be held responsible for the full cost of cleaning up a hazardous waste site. When the PRPs turn to their insurers for indemnification and defense, they are often refused. As a result, the courts have recently faced many cases concerning the scope of coverage provided to PRPs by insurance contracts. This case is another in that series, requiring us to resolve a number of disputes arising between a PRP and its insurer under Michigan law.

I

The parties have stipulated to most of the facts in this case. From 1938 to 1979, Liberty Mutual Insurance Company provided comprehensive general liability insurance to Ray Industries, Inc., and its subsidiaries, under a series of policies. Although neither party has produced copies of any of the policies for the years 1966 to 1971, or of several policies issued between 1971 and 1979, they agree that the policies from 1966 to 1979 provided, in relevant part, as follows:

[Liberty] will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of

Coverage A. bodily injury or

Coverage B. property damage

to which the policy applies, caused by an occurrence, and [Liberty] shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but [Liberty] shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The policies define an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

Ray believed that these policies covered damage due to pollution. However, in 1971, Liberty added the following provision to its policies:

This policy does not apply .... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon

land, the atmosphere or any water course or body of water; *but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental....* (emphasis added). Ray has submitted affidavits stating that it never knew of any change in its protection after 1971.

During the time period relevant to this lawsuit, Sea Ray Boats, Inc., a subsidiary of Ray's that was covered by Liberty's policies, operated a boat manufacturing plant in Oxford, Michigan. The plant generated various types of waste, including barrels or drums that had contained substances used in the manufacturing process. Although most of these discarded barrels were empty, some of them contained resinous material now suspected of contaminating the landfill. From 1966 to 1972, Sea Ray disposed of some of its waste by hauling it directly to the Metamora Landfill located in Metamora Township, Michigan; from 1972 to 1979, Bushman's Disposal, Inc., took Sea Ray's waste to the Metamora Landfill. However, Sea Ray had no knowledge of or control over Bushman's or Metamora's treatment of its waste. Metamora also accepted drums containing industrial waste from many sources other than Sea Ray between 1966 and late 1979.

The barrels taken from Sea Ray were originally dumped at the open face of the landfill or at the outer edge of an excavated area. Metamora employees used a front-end loader to push the barrels to their desired location, and then used a machine known as a "Trash Master" to crush the barrels. The Trash Master weighed at least twenty-seven tons and had six-inch metal spikes on its wheels; it sometimes tore the barrels apart and spilled their contents. Metamora's owner eventually grew annoyed at the mess caused by these barrels and began having some of them placed in a separate area. Metamora employees regularly pushed the barrels together, covered them with earth, and packed them down by running a front-end loader over them. Metamora then made a special effort to keep heavy machinery off the burial site. Although it was thought that packing earth around the barrels would prevent them from breaking, these operations may have had the opposite effect. In fact, an expert witness for Ray believes that Metamora's actions probably crushed many of the barrels, thereby releasing their contents.

In 1972, a fire burned for several days in a drum disposal area of the landfill. During the course of the fire, Metamora operators saw approximately ten drums of waste explode. However, there is no evidence that any of Sea Ray's drums were involved in this fire. The Metamora Landfill closed in 1980. Approximately five years later, Sea Ray received a letter from the EPA, informing Sea Ray that the EPA regarded it as a PRP that might be held jointly and severally liable for all costs incurred in studying and cleaning up Metamora.

A dispute subsequently arose between Liberty and Ray regarding Liberty's obligations in relation to Ray's responses to the EPA's actions. On August 19, 1988, Ray filed a complaint for declaratory judgment against Liberty in federal district court; federal jurisdiction is premised on diversity, and both parties agree that Michigan law governs this case. Ray seeks a declaration that its policies with Liberty cover all the costs of defense and indemnification resulting from the EPA's action. Liberty denies that the policies cover such a case. After conducting discovery and submitting stipulated facts, both parties moved for summary judgment. The district court ruled on these motions on December 1, 1989. It ruled (1) that the PRP letter triggered Liberty's duty to defend Ray, and (2) that the events leading to the release of Sea Ray's waste constituted an "occurrence" that was covered by the policies in question. However, it also held (3) that because the pollution exclusion clause appeared in policies issued on or after July 1, 1971, the policies only covered contamination caused before that date. It thus rejected Ray's argument that the exclusion should not apply to contamination after that date because the contamination had been "sudden and accidental." *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 728 F.Supp. 1310 (E.D.Mich.1989).

On February 7, 1990, Liberty moved for renewed discovery and reconsideration. To protect its appellate rights while this motion was pending, Liberty filed a Notice of Appeal on March 2, 1990. Ray filed a Notice of Cross–Appeal on March 14, 1990. This court determined that appeals were premature and remanded the case to the district court. On July 11, 1990, Liberty filed a "Motion with Regard to Trigger of Coverage and Apportionment of Defense and Indemnity Costs" in which it argued: (1) that Ray was covered only by the policy in effect when the contamination at Metamora manifested itself, and (2) that Liberty was obliged only to pay a certain percentage of Ray's defense and indemnity costs. After a hearing on August 13, 1990, the district court denied this motion by an order issued on September 10, 1990. Both sides then filed notices of appeal. Liberty moved to stay proceedings in this court until the Michigan Supreme Court ruled on the appeals in *Polkow v. Citizens Ins. Co. of Am.*, 438 Mich. 174, 476 N.W.2d 382 (1991), and *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 476 N.W.2d 392 (1991). These decisions were issued on August 26, 1991, and the parties then proceeded with their appeals.

## II

Under the rule established in *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court deciding a diversity case under state law must apply the law of the state's highest court. However, "[i]f the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it." *Bailey v. V & O Press Co.*, 770 F.2d 601, 604 (6th Cir.1985). "[W]e are mindful that an intermediate appellate court's judgment that announces a rule of law is 'a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" *FL Aerospace v. Aetna Casualty and Sur. Co.*, 897 F.2d 214, 218 (6th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990) (quoting *West v. American Tel. &*

*Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940)); *see also Commissioner v. Estate of Bosch*, 387 U.S. 456, 462–66, 87 S.Ct. 1776, 1781–83, 18 L.Ed.2d 886 (1967). This principle has been used on several occasions to justify refusing to follow decisions of intermediate state courts. *See, e.g., FL Aerospace, supra; Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1234 n. 11 (6th Cir.1988). "In addition, consideration may be given to ... decisions from other jurisdictions or the 'majority' rule." *Bailey,* 770 F.2d at 604.

The Michigan Supreme Court has not ruled on the question of to whether a PRP letter is a "suit" that must be defended by the insurer. Moreover, the cases that have applied Michigan law to this type of issue have reached different conclusions. For example, in holding that a PRP letter was a suit, the district court relied upon *Polkow v. Citizens Ins. Co. of Am.*, 180 Mich.App. 651, 447 N.W.2d 853 (1989); *United States Aviex Co. v. Travelers Ins. Co.*, 125 Mich. App. 579, 336 N.W.2d 838 (1983); and *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 662 F.Supp. 71, 75 (E.D.Mich.1987) (*Ex–Cell–O* I). However, other courts applying Michigan law have reached the opposite result. *See, e.g., Upjohn Co. v. Aetna Casualty and Sur. Co.*, 768 F.Supp. 1186, 1198 (W.D.Mich.1990) ("the PRP letter issued to an insured is not a 'suit' within the meaning of the general liability insurance policies"); *City of Evart v. Home Ins. Co.*, No. 103621 (Mich.Ct.App. Apr. 10, 1989) (unpublished) (the term "suit" found in a similar insurance clause did not include a notice letter sent by the Michigan Department of Natural Resources). With no specific holdings to guide us, we must analyze "all available data" to help us determine what the Michigan Supreme Court would decide. Thus, we must consider the nature of the policies in question, the significance of PRP letters, case law from other jurisdictions, and general principles of Michigan insurance law.

■ In Michigan, the following principles govern the construction of insurance contracts:

"Initially, in determining whether a policy applies, we first must determine whether the policy is clear and unambiguous on its face." We cannot create an ambiguity where none exists. Similarly we reject the temptation to rewrite the plain and unambiguous meaning of the policy under the guise of interpretation. Rather, we enforce the terms of the contract as written. If the language of the policy is unambiguous, it must be considered "in its plain and easily understood sense."

*Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 206–07, 476 N.W.2d 392, 397 (1991) (citations omitted) (quoting *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 665, 710, 443 N.W.2d 734, 739, 759 (1989) (opinion of Riley, C.J.)). Moreover, " 'the policyholder must be protected against confusing statements in policies, and, wherever there are two constructions that can be placed upon the policy, the construction most favorable to the policyholder will be adopted.' " *Powers v. Detroit Automobile Inter–Ins. Exchange*, 427 Mich. 602, 623, 398 N.W.2d 411, 420 (1986) (quoting *De-Land v. Fidelity Health & Accident Mut. Ins. Co.*, 325 Mich. 9, 37 N.W.2d 693 (1949)). Michigan courts also attempt to " 'ascertain that meaning of the contract which the insured would reasonably expect.' " *Powers*, 427 Mich. at 632, 398 N.W.2d at 424 (quoting *Gray v. Zurich Ins. Co.*, 65 Cal.2d 263, 269–70, 54 Cal.Rptr. 104, 419 P.2d 168 (1966)). "It is well-accepted that an insurer's duty to defend is considerably broader than the duty to indemnify." *Upjohn Co. v. Aetna Casualty and Sur. Co.*, 768 F.Supp. 1186, 1195 (W.D.Mich.1990).

■ Under these principles, Liberty can avoid its duty to defend only if the plain language of its policy unambiguously demonstrates that it did not contract to defend Ray in response to letters declaring Ray a PRP. According to the policies, Liberty has a "duty to defend any *suit* against the insured seeking damages on account of ... bodily injury or property damage...." Therefore, we must decide whether the PRP letter constitutes a "suit" that would trigger Liberty's duty to defend Ray.

As noted earlier, the district court below ruled in Ray's favor on this issue, holding "that a 'suit' includes a PRP letter, and any other effort to impose on the policyholders a liability ultimately enforceable by a court." *Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 728 F.Supp. 1310, 1314 (E.D.Mich. 1989). In defense of this decision, Ray emphasizes the seriousness of a PRP letter. If the letter demands disclosure of information and the PRP fails to respond, the EPA can seek civil penalties of up to $25,000 per day. 42 U.S.C. § 9604(e)(5)(B). Furthermore, the EPA can issue an administrative order requiring the PRP to take specific actions; violation of such an order "may result in civil penalties of up to $25,000 per day and punitive damages up to three times the amount of costs incurred by EPA as a result of the violation." *Browning–Ferris Indus. v. Muszynski*, 899 F.2d 151, 153 (2d Cir.1990); *see also* 42 U.S.C. §§ 9606(b), 9607(a), & 9607(c).

Throughout the investigation process, the EPA develops an administrative record for the site and makes decisions that may seriously affect the cost of cleanup. A PRP may not seek judicial review of the EPA's actions until the EPA sues for cost recovery pursuant to 42 U.S.C. § 9607(a). *See J.V. Peters & Co. v. Administrator, EPA*, 767 F.2d 263, 264–65 (6th Cir.1985). Even after a PRP gets to court, 42 U.S.C. § 9613(j)(1) limits judicial review of the EPA's actions to an administrative record that is prepared by the EPA itself, according to 42 U.S.C. § 9613(k). Ray argues that if a PRP wants to present its side of the story, it must begin submitting evidence for the administrative record immediately upon receipt of the PRP letter. Ray contends, therefore, that crucial discovery takes place between the receipt of a PRP letter and the filing of an actual complaint, and that a PRP letter must be treated as a suit, rather than simply a request or demand for compensation.

Ray also argues that Michigan law supports its conclusion. It invokes *United States Aviex Co. v. Travelers Ins. Co.*, 125

Mich.App. 579, 336 N.W.2d 838, 842 (1983), which held that the obligation of an insurer to "defend any suit against [a plaintiff] seeking damages" was dependent upon the definition of "damages" and that "damages" included sums expended by the insured in complying with equitable and injunctive orders issued by the Michigan Department of Natural Resources. Ray argues that the following language from *Aviex* should control this case:

> If the state were to sue in court to recover in traditional "damages", ... defendant's obligation to defend against the lawsuit and to pay damages would be clear. It is merely fortuitous from the standpoint of either plaintiff or defendant that the state has chosen to have plaintiff remedy the contamination problem, rather than choosing to incur the costs of clean-up itself and then suing plaintiff to recover those costs.

125 Mich.App. at 589–90, 336 N.W.2d at 843. *Polkow v. Citizens Ins. Co. of Am.,* 180 Mich.App. 651, 447 N.W.2d 853 (1989), which held that a Michigan Department of Natural Resources letter requiring an insured to investigate and remedy environmental contamination, along with a PRP letter from the EPA, triggered the insurer's duty to defend, contains similar reasoning:

> In our view, subjecting the insured to administrative mechanisms mandating an environmental investigation and cleanup, backed by the power to expose the insured to a money judgment in a court of law, amounts to a "suit" for purposes of invoking the coverage of the policy.

180 Mich.App. at 657, 447 N.W.2d at 856. Ray contends that these cases should carry great weight, as no published Michigan appellate authority refutes them.

Ray also cites cases from other jurisdictions to support its claim that a PRP letter constitutes a suit. In *Aetna Casualty and Sur. Co. v. Pintlar Corp.,* 948 F.2d 1507, 1516 (9th Cir.1991), the Ninth Circuit, applying Idaho law, determined that a PRP letter should be treated as a suit: "Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications.... [I]n a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process." In *Hazen Paper Co. v. United States Fidelity and Guar. Co.,* 407 Mass. 689, 695, 555 N.E.2d 576, 581 (1990), the Massachusetts Supreme Judicial Court held that "[t]he consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately. The EPA letter was not the equivalent of a conventional demand letter based on a personal injury claim." *See also Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200, 1206 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990) (a state environmental proceeding was "sufficiently adversarial to constitute a suit under New York law and within the meaning of the policy").

A group of business organizations has filed an *amicus* brief in support of Ray's position. In this brief, the business *amici* note that CERCLA places great importance on settling cases, as demonstrated by the following excerpt from the legislative history: "Negotiated private party actions are essential to an effective program for cleanup of the nation's hazardous waste sites and it is the intent of this Committee to encourage private party cleanup at all sites." H.R.Rep. No. 99–253, 99th Cong., 2d Sess., pt. 1, at 101 (1985), *reprinted in* 1986 U.S.Code Cong. & Admin.News 2835, 2883. They argue that most CERCLA cases will never go to court; thus, PRP's must be defended from the time they receive their letter if they are to be defended at all. They also refer to two recent opinions from Iowa and North Carolina that have adopted a broad definition of "suit." *A.Y. McDonald Indus., Inc. v. Insurance Co. of N. Am.,* 475 N.W.2d 607, 628 (Iowa 1991) ("a 'suit' under the policies here includes any attempt to gain an end by legal process"); *C.D. Spangler Constr. Co. v. Industrial Crankshaft and Eng'g Co.,* 326 N.C. 133, 153, 388 S.E.2d 557, 569 (1990) (compliance orders requiring lessors and lessees of property to take certain remedial

actions required by state law were "suits" triggering a duty to defend).

Thus, Ray and the business *amici* have produced impressive support for their claim that a PRP letter constitutes a "suit" that requires Liberty to defend it. The fact that several courts have reached this same conclusion constrains us to take it seriously; we do not lightly disagree with other courts. However, numerous courts have reached the opposite conclusion. Besides the cases involving Michigan law noted above, several other cases have adopted a narrow definition of "suit." *See, e.g., Patrons Oxford Mut. Ins. Co. v. Marois*, 573 A.2d 16 (Me.1990) ("the duty to defend the insured against 'any suit ... seeking damages' does not include an administrative proceeding that can award no damages."); *Ryan. v. Royal Ins. Co.*, 916 F.2d 731 (1st Cir.1990) (correspondence received by insured from New York environmental agency not the functional equivalent of suit absent evidence of coerciveness or serious state enforcement effort). Having reviewed the case law and the record in this case, we agree with these cases. Accordingly, we hold that the Michigan Supreme Court would reject *Polkow v. Citizens Ins. Co. of Am.*, 180 Mich.App. 651, 447 N.W.2d 853 (1989) and the other cases cited by Ray and the business *amici*, and would adopt a narrow definition of the word "suit." Consequently, we do not believe that the PRP letter triggered Liberty's duty to defend in this case.

In reaching this conclusion, we rely upon the well-recognized principle that "[i]f the terms of [an insurance] contract are plain and unambiguous, their plain meaning should be given effect." *Murphy v. Seed-Roberts Agency*, 79 Mich.App. 1, 7, 261 N.W.2d 198 (1977); *see also Wozniak v. John Hancock Mut. Life Ins. Co.*, 288 Mich. 612, 286 N.W. 99 (1939). We believe that "suit" has a plain and unambiguous meaning that excludes the PRP letter in this case. In common usage, a suit generally involves an adjudicatory proceeding in a court of law. A well-known dictionary provides the following definition: "the attempt to gain an end *by legal process:* prosecution of right before any tribunal

... *an action or process in a court* for the recovery of a right or claim: a legal application *to a court* for justice." Webster's Third New International Dictionary 2286 (P. Gove, ed. 1961) (emphasis added). A prominent legal dictionary gives "suit" a similar definition, calling it ·

[a] generic term, of comprehensive signification, and applies to *any proceeding* by one person or persons against another or others in *a court of justice* in which the plaintiff pursues, in such court, the remedy which the law affords him for the redress of an injury or the enforcement of a right, whether at law or in equity.

Black's Law Dictionary 1603 (4th ed. 1951) (emphasis added).

These definitions strike us as clear and straightforward: a "suit," as that term is used both in conversation and in dictionaries, is an attempt to gain an object *in the courts.* The term refers to formal legal proceedings, as opposed to demands and other tactics that, however powerful, are not enforced by a court of law. We reject any attempt to allow phrases that appear in the definitions of "suit," such as "legal process," to expand this term beyond its traditional meaning to include a plethora of quasi-judicial actions from administrative orders to bureaucratic regulations. In recent years, the lines between the branches of government have become blurred; numerous executive and legislative agencies, along with certain private actors such as arbitrators, now have some form of adjudicative power. Rather than expanding the definition of "suit," however, we believe that this development highlights the term's traditional meaning, as it generally refers only to those proceedings that take place in a court of law, as opposed to other means of adjudication.

Our decision is supported by numerous decisions interpreting Michigan law. "The Court cannot construe the EPA's threat to hold Harter liable for clean up costs as a suit seeking damages without doing violence to the plain and ordinary meaning of the word 'suit.' " *Harter Corp. v. Home Indem. Co.*, 713 F.Supp. 231, 232

(W.D.Mich.1989). "While the contracts do not define the term 'suit,' that term has a well-accepted ordinary meaning. In plain language, the term refers to court proceedings." *Arco Indus. Corp. v. Travelers Ins. Co.*, 730 F.Supp. 59, 66 (W.D.Mich.1989); *see also Central Quality Serv. Corp. v. Insurance Co. of N. Am.*, No. 87–74473, slip op. at 19 (E.D.Mich. Sept. 6, 1989) (unpublished).

Furthermore, the policies in question distinguished between a "suit" and a "claim" in several places. For example, while Liberty has "the right and duty to defend any *suit*," it may "make such investigation and settlement of any *claim or suit* as it deems expedient." Thus, while Liberty has the power to investigate any claim, it contracted to defend only suits. This distinction is implied elsewhere in the policies. For example, in the section entitled "Supplemental Payments," Liberty agrees to pay

> all costs taxed against the insured in any suit defended by the company, and all interest on the entire amount of any *judgment* therein which accrues after entry of the judgment and before the company has paid or tendered or deposited *in court* that part of the judgment which does not exceed the limit of the company's liability thereon;

(emphasis added). The same section of the policies also refers to "appeal bonds." Thus, the policies obviously assume that a "suit" involves courts, judgments, and possible appeals. Ray's reading ignores this fact, and renders the distinction between "claim" and "suit" superfluous.

■ However, under Michigan law, we must construe the policy in such a manner as to give meaning to the distinction between claims and suits. The Michigan Supreme Court "will give effect to all words in an insurance contract if they serve a reasonable purpose." *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 688, 443 N.W.2d 734, 749 (1989). Furthermore, when interpreting an insurance policy: "Meaning should be given to all terms. Ambiguities should not be forced. *Conflicts among clauses should be harmonized.*" *Fresard v. Michigan Millers Mut. Ins. Co.*, 414

Mich. 686, 327 N.W.2d 286, 289 (1982) (emphasis added). These principles have been recognized in Michigan for many years:

> "The intention of the parties must be deduced from the entire agreement, not from any part or parts of it, and, where a contract has several stipulations, the intention of the contracting parties is not expressed by any single clause or stipulation, but *by every part and provision in it, which must all be considered together, and so construed as to be consistent with every other part.*"

*Johnston v. Miller*, 326 Mich. 682, 40 N.W.2d 770, 771–72 (1950) (emphasis added) (quoting *Prowant v. Sealy*, 77 Okl. 244, 187 P. 235 (1919)); *see also DeBoer v. Geib*, 255 Mich. 542, 238 N.W. 226 (1931) ("A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all its provisions.") By adopting a narrow definition of "suit," we fulfill these precepts of Michigan law by assuring that the distinction drawn between "suits" and "claims" in the insurance policies will be respected.

We also note that CERCLA itself recognizes a distinction between lawsuits and PRP notice letters. The letter in this case merely warned Ray of its potential liability, pursuant to § 104 of CERCLA, 42 U.S.C. § 9604. But the EPA has express authority to file a lawsuit to recover, among other things, "all costs of removal or remedial action" incurred by the government, 42 U.S.C. § 9607(a)(4)(A); it has simply chosen not to do so in this case. Thus, the definition of "suit" that we adopt recognizes the variety of options available to the EPA in enforcing CERCLA. Like other claimants, the EPA threatens litigation and makes other efforts to pressure potentially liable parties; but these threats, however seriously they may be taken, do not constitute a lawsuit.

Our decision is further supported by numerous Michigan cases that assume a connection between the filing of a complaint and the triggering of a duty to defend. "The duty of the insurer to defend the insured depends upon the allegations in the

*complaint* of the third party in his or her action against the insured." *Detroit Edison Co. v. Michigan Mut. Ins. Co.,* 102 Mich.App. 136, 301 N.W.2d 832, 835 (1980) (emphasis added). "The allegations contained in the underlying *complaint* generally determine an insurer's duty to defend." *Iowa Kemper Ins. Co. v. Ryan,* 172 Mich.App. 134, 431 N.W.2d 434, 436 (1988) (emphasis added). "Whether the claim is for an injury that is covered by the policy is determined by the allegations in the *complaint* against the insured." *Frankenmuth Mut. Ins. Co. v. Beyer,* 153 Mich.App. 118, 395 N.W.2d 36, 38 (1986) (emphasis added). These references to the "complaint" clearly indicate that insurers generally contract to defend suits filed in a court, rather than mere allegations or threats.

Furthermore, environmental statutes are hardly unique in encouraging compliance without litigation. For example, in *Solo Cup Co. v. Federal Ins. Co.,* 619 F.2d 1178 (7th Cir.), *cert. denied,* 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), the General Services Administration accused a corporation of discriminating against seventy-two female employees with respect to initial job placement. It proposed that the corporation pay the alleged victims of discrimination $266,667 in backpay and interest as a basis of conciliation; however, no adjudicatory proceedings took place. Although any corporation would certainly feel pressure to agree to such a proposal, the Seventh Circuit concluded that the GSA's actions did not require the corporation's insurer to fulfill its duty to defend. A similar decision occurred in *Campbell Soup Co. v. Liberty Mut. Ins. Co.,* 239 N.J.Super. 403, 571 A.2d 969 (App.Div.), *certification denied,* 122 N.J. 163, 584 A.2d 230 (1990), which concerned a discrimination claim pending before the Equal Employment Opportunity Commission. The Appellate Division of the New Jersey Superior Court agreed with the trial court's determination that

> the EEOC's reasonable cause determination was not "the functional equivalent of a suit so as to compel the insurers ... to defend plaintiff against charges of discriminatory employment practices [,]" and that *"the duty to defend is triggered when the insured is involved in an adversarial proceeding, a consequence of which is the factual determination that legal liability may or may not be imposed upon the insured."*

239 N.J.Super. at 406, 571 A.2d at 970–71. (emphasis added). (quoting the trial court's opinion, *Campbell Soup Co. v. Liberty Mut. Ins. Co.,* 239 N.J.Super. 488, 571 A.2d 1013 (Ch.Div.1988)).

In reaching our decision on this issue, we refuse to follow the two Michigan appellate cases relied upon by Ray, *United States Aviex Co. v. Travelers Ins. Co.,* 125 Mich. App. 579, 336 N.W.2d 838 (1983) and *Polkow v. Citizens Ins. Co. of Am.,* 180 Mich. App. 651, 447 N.W.2d 853 (1989). In *Aviex,* which involved an order from the Michigan Department of Natural Resources, an insurer argued that the trial court "incorrectly construe[d] the insurance agreement to cover sums of money expended by [the insured] in response to equitable or injunctive orders, instead of covering only money paid or ordered to be paid as *compensation* for injury or loss." 336 N.W.2d at 842 (emphasis in original). Thus, the primary issue concerned the definition of "damages," rather than "suits"; and the court simply found no difference between costs resulting from injunctive relief and costs resulting from a claim for reimbursement. The *Polkow* court, which held that an insurer's duty to defend was triggered by letters from the Michigan Department of Natural Resources and the EPA, acknowledged that its result constituted an "extension of [*Aviex*'s] precise holding." 447 N.W.2d at 855 (footnote omitted). Thus, *Aviex* can clearly be distinguished from this case.

*Polkow,* however, involved a PRP letter, and therefore must be considered more seriously. Nevertheless, for the reasons given above, we are convinced that the Michigan Supreme Court would not follow *Polkow* in this case. By adopting such a broad definition of "suit," the *Polkow* court simply failed to give that term its plain meaning, as required by Michigan law. We are

not alone in rejecting *Polkow. See, e.g., Upjohn Co. v. Aetna Casualty and Sur. Co.,* 768 F.Supp. 1186, 1197–99 (W.D.Mich. 1990); *Detrex Chem. Indus. v. Employers Ins. of Wausau,* 746 F.Supp. 1310, 1314–15 (N.D.Ohio 1990). Furthermore, *Polkow* does not represent the only statement on this question from the Michigan appellate courts; as noted earlier, *City of Evart v. Home Ins. Co.,* No. 103621 (Mich.Ct.App. Apr. 10, 1989) (unpublished) reached almost the opposite result. Finally, *Polkow* was reversed and remanded by the Michigan Supreme Court in order to determine whether the pollution exclusion clause of the policy in question precluded coverage. *Polkow v. Citizens Ins. Co. of Am.,* 438 Mich. 174, 476 N.W.2d 382 (1991). Because it remanded the case on other grounds, the Michigan Supreme Court refused to rule on the issue of whether a PRP letter constituted a "suit." For all of these reasons, we refuse to follow the decision of the Michigan Court of Appeals in *Polkow.*

Although we reject Ray's argument that a PRP letter constitutes a "suit" within the meaning of Liberty's policies, we wish to emphasize that we fully recognize the seriousness of such a letter. By enacting CERCLA, Congress has given extraordinary powers to the EPA, and any company that received a PRP notice letter would certainly be justified in taking it very seriously. PRP letters may even represent a unique legal creation, with no true parallel in any other area of administrative law. But the fact that Congress chooses to create a new and more powerful type of claim does not justify our deviating from the plain language of the contracts. We must construe the policies as they were written, and give each party exactly what it contracted for. By limiting its duty to defend to "suits," Liberty unambiguously demonstrated its intention to avoid responsibility for any action that fell outside the traditional and well-recognized meaning of that term. This court will not deprive Liberty of the benefit of its bargain by forcing it to insure against the creation of a new type of legal action, a risk for which it was not paid. Thus, we reverse the judgment of the district court, and hold that Liberty's duty to defend was not triggered by Ray's PRP letter.

## III

As noted earlier, Liberty filed a "Motion with Regard to Trigger of Coverage and Apportionment of Defense and Indemnity Costs," in which it requested an order "that only the policy in effect when the contamination at the Metamore [sic] Landfill manifested itself can provide coverage to Ray." In an "Order of Final Judgment" filed on September 20, 1990, the district court recorded its denial of this motion; both parties subsequently filed their notices of appeal from this order. Ray now argues that this court should not consider the issues raised in Liberty's motion regarding triggering of coverage and apportionment of defense, on the grounds that it was not properly raised before the district court below. It argues that appellate courts "do not sit to hear cases de novo. The time for sorting out theories begins long before the filing of a Notice of Appeal." *Commercial Standard Ins. Co. v. Bryce Street Apartments, Ltd.,* 703 F.2d 904, 908 (5th Cir.1983). Ray notes that the motion in question was filed on July 13, 1990, eight months after the original opinion was issued, and four months after Liberty's original Notice of Appeal. Nevertheless, we believe that this issue is properly before us. As noted earlier, this court determined that the original Notice of Appeal was premature and remanded the case to the district court. In its judgment dated September 20, 1990, the district court specifically stated that it had re-opened the case, heard oral arguments on Liberty's motion, and ruled on it. Thus, the issues raised in that motion were ruled upon by the district court, making it appropriate for us to proceed to the merits of Liberty's claim.

Generally, there are four possible answers to the question of what must occur during the policy period to trigger coverage.

> If coverage is triggered at the time that ... property damage becomes known to the victim or property owner, the ap-

proach is identified as the "manifestation theory." If coverage is triggered when ... actual property damage first occurs, the approach is called the "injury in fact theory." If coverage is triggered when the first exposure to injury-causing conditions occurs, then the court is said to have chosen the "exposure theory." Finally, if coverage is triggered in a manner such that insurance policies in effect during different time periods *all* impose a duty to indemnify, then the approach is labelled a "continuous" or "multiple" trigger theory.

*Dow Chem. Co. v. Associated Indem. Corp.*, 724 F.Supp. 474, 478 (E.D.Mich. 1989) (emphasis in original). Liberty urges this court to adopt the "manifestation" theory, and hold that only those policies in effect when the property damage was discovered can provide coverage to Ray.

The Michigan Supreme Court has not addressed this issue. However, Liberty relies on *Transamerica Ins. Co. of Mich. v. Safeco Ins.*, 189 Mich.App. 55, 472 N.W.2d 5 (1991), in which the Michigan Court of Appeals considered a case involving the installation of urea-formaldehyde insulation. The insulation gave off allegedly harmful gases to which the inhabitants of a house were continuously exposed. In determining when insurance coverage for such damage was triggered, the court reached the following conclusion:

> We affirm to the extent the trial court found that coverage under the respective comprehensive liability policies in question is triggered by *the manifestation of injury or damage* resulting from a claimant's exposure to urea-formaldehyde gas, but remand for a determination of when various underlying plaintiffs' symptoms or damages manifested themselves.

472 N.W.2d at 6 (emphasis added). Liberty contends that *Transamerica* should control this case, because it demonstrates that under Michigan law, the "manifestation" rule applies to cases involving long-term exposure to latent injury. Because the record does not establish when the damage at Metamora first manifested itself, Liberty urges us to remand this case to the district

court with orders to make such a finding. It believes that there may have been no manifestation of damage before July 1, 1971, when it included a pollution exclusion in its policies. Since each policy covered only property damage that occurred "during the policy period," Liberty reasons that it could thus escape all liability for the Metamora site.

Furthermore, it claims that the "manifestation" theory found in *Transamerica* represents the rule in most jurisdictions. "The general rule is that an occurrence happens when the injurious effects of the occurrence become 'apparent,' or 'manifest themselves.'" *Honeycomb Sys., Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400, 1405 (D.Me.1983). The Fourth Circuit recently reached a similar conclusion:

> There are situations ... in which the existence or scope of damage remains concealed or uncertain for a period of time even though damage is occurring. The leakage of hazardous wastes as in this case is a clear example.... In such cases we believe that the better rule is that the occurrence is deemed to take place when the injuries first manifest themselves.

*Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325, 1328 (4th Cir.1986).

The law surrounding this issue is quite complex, as courts attempt to apply the language of comprehensive general liability policies to a wide variety of fact situations. Each side has presented a number of cases in support of its position. However, we need not attempt to unravel the numerous strands of legal doctrine involved in those cases, nor need we establish a general rule to apply in all cases, to conclude that the manifestation theory is inappropriate in this case. Liberty's policies define an occurrence as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage." Property damage, in turn, is defined as "physical injury to ... tangible property *which occurs during the policy period.*" (emphasis added). As noted earlier, no one disputes that drums containing resin were constantly dumped in Metamora

between 1966 and 1979; thus, contamination occurred during every year in question. The "injury to . . . tangible property," if such there was, occurred throughout the period. We hold, therefore, that the plain language of the policies indicates that every policy written during the period was triggered by the events at Metamora, unless the pollution exclusion prevented such a result.

Our holding on this issue coincides with numerous cases involving Michigan law. In *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 685 F.Supp. 621, 626 (E.D.Mich. 1987) (*Ex–Cell–O* II), the district court stated:

> [T]he parties dispute the appropriate trigger of coverage. The policies cover occurrences within the policy period. I hold that each exposure of the environment to a pollutant constitutes an occurrence and triggers coverage. *See [Continental Ins. Cos. v. Northeastern Pharmaceutical and Chem. Co.*, 811 F.2d 1180, 1189 (8th Cir.1987)] ("We . . . adopt the majority view that environmental damage occurs at the moment that hazardous wastes are improperly released."). This holding parallels the rule established in the analogous situation of insurance coverage for asbestos claims.

(emphasis added). *See also Dow Chem. Co. v. Associated Indem. Corp.*, 724 F.Supp. 474, 487 (E.D.Mich.1989) (court rejects manifestation theory and adopts "injury in fact" theory); *Detrex Chem. Indus. v. Employers Ins. of Wausau*, 746 F.Supp. 1310, 1324–25 (N.D.Ohio 1990) ("This court believes that faced with this question, the Michigan Supreme Court would adopt the injury in fact trigger of coverage. . . .").

We also conclude that *Transamerica* is inapposite to this case. That case was a products liability action, and thus differed from a CERCLA case in which one release of toxic waste can render the insured liable for the entire cleanup of the release site. Furthermore, *Transamerica* really involved a dispute among multiple insurers as to how coverage should be apportioned; Transamerica had already provided a full defense and indemnification to policyholders in the underlying action. Moreover, this court recently refused to follow *Transamerica* in *Inland Waters Pollution Control, Inc. v. National Union Fire Ins. Co.*, 943 F.2d 52 (6th Cir.1991) (unpublished). In that case, we noted that

> [t]he manifestation theory generally has been applied in cases involving a latent disease, such as asbestosis, where, due to the length of time between initial exposure to the harmful substance and diagnosis of the disease, there are multiple insurance carriers who are potentially liable. Similar factors were present in *Transamerica* and made application of the manifestation theory appropriate in that case. However, those factors are not present in this case, and their absence counsels against application of the manifestation theory.

We adopt the same analysis, and conclude that the Michigan Supreme Court would not follow *Transamerica* in this case. Thus, we hold that under the stipulated facts of this case, an "occurrence" within the meaning of the policies issued by Liberty took place during each of the years in question.

## IV

As noted earlier, Liberty added a pollution exclusion to its policies in 1971; however, that clause provides that the exclusion does not apply if the pollution in question was "sudden and accidental." In its cross-appeal, Ray contends that the Metamora pollution falls within this exclusion. It claims that it never knew that its drums contained hazardous materials. Furthermore, neither Ray nor Metamora knew that the method used to bury Sea Ray's barrels caused them to shatter and spill their contents. Ray also insists that it should not be blamed for the 1972 fire at Metamora, in which several barrels exploded. Thus, Ray argues that any contamination at Metamora resulted from specific and discrete events, rather than a continuous process, and must be considered "sudden and accidental."

Ray argues that the case law surrounding the definition of "sudden" has always

focused upon the nature of each specific release. In *American States Ins. Co. v. Maryland Casualty Co.*, 587 F.Supp. 1549 (E.D.Mich.1984), the district court applied a pollution exclusion, but emphasized that no one ever suggested that the insured's actions were unintentional. "While allegations as to [the polluter's] involvement in the illegal dumping are very general, and it is never expressly alleged that the dumping was a regular part of its business, it is significant that it is never even suggested that the dumping was unintended, unexpected, sudden or by accident." 587 F.Supp. at 1553. Furthermore, in *Jonesville Prod., Inc. v. Transamerican Ins. Group*, 156 Mich.App. 508, 402 N.W.2d 46 (1986), the Court of Appeals reversed the trial court's application of a pollution exclusion:

> We find that the circuit court failed to distinguish between the *frequency* of acts which resulted in the release of contaminants and plaintiff's *knowledge or notice* of the release of pollutants as a result of those acts.... There may have been either intentional dumping or burial, unintentional spills or leaks from inadequate containers, or other accidents....

156 Mich.App. at 512, 402 N.W.2d at 48 (emphasis added). Even when a federal district court concluded that "sudden" meant "brief, momentary or lasting only a short time," it emphasized the importance of the actual releases: "The focus of the pollution exclusion is on the discharge or release of pollutants into the environment." *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1326–27 (E.D.Mich.1988) (*Ex–Cell–O* III).

Ray argues that while the district court in *Ex–Cell–O* III began with the proper premise, it reached the wrong conclusion because of this court's decision in *United States Fidelity and Guar. Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988). *Star Fire* involved "coal dust [that] was generated by the normal operation of the tipple and was routinely discharged on a regular, continuing basis." *Id.* at 32. Thus, Ray argues, that case involved a continuous discharge of pollution, rather than a series of discrete polluting events. The *Star Fire* court then went on to hold:

> We believe it is impossible to characterize these discharges of coal dust as "sudden" within the plain and obvious meaning of that term. While the district court may have been correct that the damage[s] resulting from the discharges were unintended and unexpected, that is not the ultimate question. The ultimate question is whether the *discharges* of coal dust were sudden and accidental; they clearly were not.

*Id.* at 35 (emphasis added). Ray contends that in our case the district court misinterpreted *Star Fire* to mean that releases that occurred over a period of years could never be viewed as sudden and accidental. It urges this court to correct that misinterpretation, and claims that courts should always focus on each individual release.

Ray next refers us to *FL Aerospace Corp. v. Aetna Casualty and Sur. Co.*, 897 F.2d 214 (6th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). It contends that this court recognized that long-term activities could still cause "sudden and accidental" damage.

> [W]e cannot agree with Aetna's position that simply because Berlin & Ferro transported some 500,000 gallons of Midland–Ross waste to the Berlin & Ferro site over a period of years, any discharges cannot be considered sudden and accidental. The "sudden and accidental" exception applies to the discharge, release, dispersal or escape of pollutants into the environment. Mere delivery of waste for storage at a facility that is licensed to store waste is not a discharge of pollutants into the environment.

*Id.* at 220. However, this court ruled in favor of the insurer; we stated that "there is no evidence from which the trial court could have found" that the discharges in that case were sudden or accidental. *Ibid.* A similar conclusion was reached in *Grant–Southern Iron & Metal Co. v. CNA Ins. Co.*, 905 F.2d 954 (6th Cir.1990):

> Although Grant–Southern's primary argument was that this court should follow the [*Jonesville Prod., Inc. v. Transamer-*

*ican Ins. Group*, 156 Mich.App. 508, 402 N.W.2d 46 (1986) ] interpretation of sudden and accidental, Grant–Southern also maintains that whatever damages were caused by its discharges of pollutants may have been the result of a few discrete polluting events, each of which was short in duration and accidental in nature. If that is the case, then the pollution alleged in the underlying state actions could properly fall within the "sudden and accidental" exception and CNA would be obligated to defend and indemnify Grant–Southern in those actions.

905 F.2d at 957.

The Michigan Supreme Court relied upon *Grant–Southern* in the recent case of *Polkow v. Citizens Ins. Co. of Am.*, 438 Mich. 174, 476 N.W.2d 382 (1991), in which it reversed and remanded the lower court's ruling. The remand was for the purpose of finding the facts surrounding the discharge:

> [R]esolution of whether the sudden and accidental exception applies is impossible, given the current state of factual development. The resolution of this question requires and examination of whether the *discharge* of pollutants was sudden and accidental. On a record where it is unclear even *what* the discharge was, how can we, absent some form of augury, possibly declare that this unknown form of discharge was not sudden and accidental?

438 Mich. at 179, 476 N.W.2d at 384 (emphasis in original).

■ Ray argues that not only should these cases be followed, but that no remand is necessary. It contends that "compelling evidence" demonstrates that the releases that occurred were unexpected, unintended, and instantaneous. Under its interpretation of the facts, Sea Ray was simply disposing of its trash. Some of the trash consisted of barrels, most of which were empty, although some contained a substance that did not appear hazardous, and may not even be hazardous. Furthermore, the barrels might never have spilled had Metamora not crushed them with its Trash Master. Thus, Ray contends, this case does not involve a company knowingly spilling massive quantities of toxic liquids in the countryside. In light of these facts, it concludes, this court should ignore the pollution exclusion and hold Liberty liable on all of the policies issued.

We are not persuaded by Ray's argument. Whatever the other facts may have been, the parties clearly stipulated that the barrels were routinely crushed on a regular basis. We believe that this fact outweighs all others, and that Ray's actions therefore cannot fit the definition of "sudden and accidental" adopted by the Sixth Circuit and the Michigan Supreme Court:

> We conclude that when considered in its plain and easily understood sense, "sudden" is defined with a "temporal element that joins together conceptually the immediate and the unexpected." *Star Fire Coals, supra* at 34. The common, everyday understanding of the term "sudden" is " 'happening, coming, made or done quickly, without warning or unexpectedly; abrupt.' " *FL Aerospace, supra* at 219. "Accidental" means "[o]ccurring unexpectedly and unintentionally; by chance." *The American Heritage Dictionary: Second College ed.*, p. 72. . . . Thus, we find that the terms "sudden" and "accidental" used in the pollution-exclusion clause are unambiguous.

*Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 207–08, 476 N.W.2d 392, 397–98 (1991) (footnote omitted). Having adopted this definition, the *Upjohn* court "reject[ed] the definition of 'sudden and accidental' as set forth by the Michigan Court of Appeals in [*Jonesville Prod., Inc. v. Transamerican Ins. Group*, 156 Mich. App. 508, 402 N.W.2d 46 (1986) ]." 438 Mich. at 208, 476 N.W.2d at 397.

We are not convinced that the discharges in this case were brief or momentary. Ray has argued that each release was sudden, when viewed in isolation. But under this theory, *all* releases would be sudden; one can always isolate a specific moment at which pollution actually enters the environment. Rather than pursuing such metaphysical concepts, we choose to recognize

the reality of Sea Ray's actions in this case. We agree with the First Circuit that

> [m]ere speculation under these circumstances that any individual instance of disposal, including leaks, occurred "suddenly" cannot contradict a reasonable reading of the allegations that the entire pattern of conduct was not a "sudden and accidental" occurrence.

*A. Johnson & Co. v. Aetna Casualty and Sur. Co.*, 933 F.2d 66, 75 (1st Cir.1991). Thus, following the passage from *Upjohn* cited above, as well as the Sixth Circuit cases cited by Ray, we hold that the discharges in this case were not "sudden," even if they involve numerous discrete events. Thus, we hold that the pollution exclusion applies to this case, and Liberty has no obligation under the facts of this case on any of the policies it issued to Ray containing the exclusion.

### V

■ We have held that while the Liberty policies in effect for the years 1966–70 cover damage caused by the discharge of pollutants, the policies issued after July 1, 1971 do not; that under the stipulated facts of this case an "occurrence," within the meaning of the policies issued by Liberty, took place during each of the years in question; and that because the EPA letter is not a "suit," Liberty's duty to defend has not been triggered. We must now address Liberty's argument that, if that duty to defend is triggered in the future by a suit, the costs of defense and indemnity resulting from events at Metamora, which took place from 1966 through 1979, should be apportioned between Ray and Liberty to take into account the fact that Ray had no pollution insurance from Liberty after July 1, 1971.

Liberty invokes *Insurance Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir.1980), *reh'g granted in part*, 657 F.2d 814 (6th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), in which this court stated that:

> The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim

which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk.

633 F.2d at 1224–25. Here, Liberty argues, the "distinction can be readily made"; Ray was not covered for damage after July 1, 1971. This rule also applies to apportionment of indemnity costs. *See Porter v. American Optical Corp.*, 641 F.2d 1128, 1145 (5th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981) (adopting *Forty–Eight Insulations*). Thus, Liberty contends, it cannot be held liable for more than 36% of Ray's defense costs and indemnity payments, reflecting the five years (1966–70) out of fourteen (1966–79) during which the pollution exclusion provision did not apply.

Liberty notes that under CERCLA, Ray became potentially jointly and severally liable for all costs associated with Metamora every time it disposed any hazardous substance there. Thus, it maintains, the only reasonable means of apportionment is one based upon years of coverage. Other apportionment schemes, such as volume of waste sent in varying years, fail to reflect the reality that all shipments carried equal legal importance. Furthermore, it applies the same reasoning to argue that defense costs should similarly be apportioned. Liberty need only defend Ray on the policies issued between 1966–70; after that, it claims that it owes no duty to Ray. In *Lee v. Aetna Casualty and Sur. Co.*, 178 F.2d 750 (2d Cir.1949), Judge Learned Hand wrote:

> if the plaintiff's complaint against the insured alleged facts which would have supported a recovery covered by the policy, it was the duty of the defendant to undertake the defense, *until it could confine the claim to a recovery that the policy did not cover*.

178 F.2d at 753 (emphasis added). Numerous cases recognize this limitation on the insurer's duty to defend. *See, e.g., Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d

Cir.1985) ("duty to defend remains ... until the insurer can confine the claim to a recovery that is not within the scope of the policy"); *Harborside Refrigerated Servs. Inc. v. IARW Ins. Co.*, 759 F.2d 829, 830 (11th Cir.1985); *American Contract Bridge League v. Nationwide Mut. Fire Ins. Co.*, 752 F.2d 71, 75 (3d Cir.1984). Thus, Liberty concludes, Ray must bear a *pro rata* share of its defense from 1971 to 1979.

In response, Ray repeats its argument, discussed earlier on the "manifestation" issue, that Liberty has failed properly to preserve this issue for appeal. However, we reject that argument for the same reasons given earlier. Nevertheless, we agree with Ray that Liberty's argument misreads the district court's ruling below. The district court clearly apportioned indemnity under CERCLA, holding that Liberty need not pay for damage that took place after 1971. The district court also considered apportioning defense costs, but refused to do so, due to the state of the EPA's proceedings at that time:

> The declaratory judgment action now before me has not addressed EPA's allegations, nor should it. Where a declaratory judgment proceeding involves a liability insurer, that proceeding should deal only with questions of policy coverage, not the insured's liability to the injured party. Since the action before me has not addressed the scope of EPA's allegations against Ray, I have not reached the issue whether EPA alleged a liability covered by the parties. Liberty's duty to defend continues until these questions are resolved.

*Ray Indus., Inc. v. Liberty Mut. Ins. Co.*, 728 F.Supp. 1310, 1320 (E.D.Mich.1989) (citation omitted). Thus, the district court held that while Ray is entitled to indemnity and defense based on the policies from 1966–70, it gets no indemnity or defense based on the policies from 1971–79. It also held that Liberty must defend Ray until the underlying dispute between the EPA and Ray is resolved. We hold that the district court has already apportioned the costs as much as was necessary.

Once again, our decision rests upon the plain language of Liberty's policy, which states that Liberty shall defend Ray against "any suit ... seeking damages ... even if any of the allegations of the suit are groundless, false or fraudulent...." Thus, because the insurance policies in effect from 1966 through July 1, 1971 do cover damage due to pollution, Liberty must defend Ray in any suit seeking damages from Ray on account of the Metamora events. Liberty's duty to defend continues until either the facts demonstrate, or the complaint is limited to allegations, that the actual pollution damage is attributable only to matters that are not properly within the scope of those policies' coverage. At this time, that has not happened. Thus, the duty to defend in this case is connected to those policies under which Ray is entitled to coverage. However, Liberty now seeks another apportionment that will further reduce Ray's coverage. This claim violates the plain language of the policy; because full liability can result from *every policy*, Ray has coverage up to the policy limits for each of five years from 1966–70. On the other hand, the district court's ruling prevents Ray from receiving any protection for the other nine years of coverage. Liberty now wants this court to eliminate 64% of Ray's coverage for the years 1966–70, simply because there is no coverage for 1971–79.

We reject this argument. The duty to defend constitutes the provision of a service, not the payment of money; such a duty is not easily apportioned. Furthermore, under Michigan law, an insurer's duty to defend "is broader than its duty to pay or the limits of its policy coverage." *Iacobelli Constr. Co. v. Western Casualty & Sur. Co.*, 130 Mich.App. 255, 343 N.W.2d 517, 520 (1983). The insurer must defend the suit "so long as the allegations against the insured *even arguably* come within the policy coverage." *Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 102 Mich.App. 136, 301 N.W.2d 832, 835 (1980) (emphasis in original). Finally, "any doubt as to the extent of coverage [for defense costs] is to be resolved in the insured's favor." *Illinois Employers Ins. of Wausau v. Drago-*

*vich,* 139 Mich.App. 502, 506, 362 N.W.2d 767, 769 (1984). These principles require Liberty to provide Ray with a full defense under the policies issued between 1966–70.

We note that Liberty's duty to defend does not extend to matters that would have no relation to the 1966–70 policies. Given the nature of CERCLA litigation, it is not clear that such matters exist. If they do exist, however, Liberty would have a right to refuse to defend against them, through an aggressive exercise of this right could put it at risk for charges of failure to defend in bad faith. Rather than mechanically apportioning costs, the proper solution would seem to be for Ray to provide its own defense for matters lying outside the duty to defend triggered by the 1966–70 policies, at least to the extent of monitoring the case to determine if such a separate defense were needed.

### VI

In conclusion, we hold that a PRP notice letter from the EPA does not constitute a "suit" that triggers Liberty's duty to defend. We reject Liberty's argument that the "manifestation" theory should apply, and hold that the events in question constitute an "occurrence" within the meaning of each policy between 1966 and 1979. However, we do not believe that the events in question were "sudden and accidental," and thus Ray can claim no coverage under the policies containing a pollution exclusion. Finally, we hold that while Liberty need not indemnify Ray for events taking place after the pollution exclusion was added to the policies, its duty to defend Ray, if triggered, would continue until all questions involving the policies from 1966 to 1970 were resolved. Thus, the judgment of the district court is AFFIRMED in part and REVERSED in part.