The HARLEYSVILLE MUTUAL
INSURANCE COMPANY,
INC., Plaintiff,

v.

SUSSEX COUNTY, DELAWARE,
Defendant.

SUSSEX COUNTY, DELAWARE,
Plaintiff,

v.

MARYLAND CASUALTY COMPANY
and Northern Insurance Company
of New York, Defendants.

SUSSEX COUNTY, DELAWARE,
Plaintiff,

v.

THE HOME INSURANCE COMPANY
and The Home Indemnity Company,
Defendants.

Civ. A. Nos. 92–144–RRM, 92–289–
RRM and 92–513–RRM.

United States District Court,
D. Delaware.

Aug. 27, 1993.

Daniel L. McKenty, and Keith E. Donovan, Swartz, Campbell and Detweiler, Wilmington, DE, Anthony J. Zarillo, Jr., Riker, Danzig, Scherer, Hyland and Perretti, Morristown, NJ, for Harleysville Mut. Ins. Co., Inc.

B. Wilson Redfearn, Dawn L. Becker, Tybout, Redfearn & Pell, Wilmington, DE, John B. Wyss, Thomas W. Brunner, Ida C. Wurczinger, David R. Anderson, Cynthia A. Capwell, Wiley, Rein & Fielding, Washington, DC, for Maryland Cas. Co. and Northern Ins. Co. of New York.

Norman M. Monhait, Carmella P. Keener, Rosenthal, Monhait and Gross, Wilmington, DE, Stephen A. Fennell, Stephanie A. Philips, Steptoe and Johnson, Washington, DC, for The Home Ins. Co. and The Home Indem. Co.

Richard E. Poole, Gregory A. Inskip, and Stephen C. Norman, Potter Anderson and Corroon, Wilmington, DE, and Dennis L. Schrader, Wilson, Halbrook and Bayard, Georgetown, DE, for Sussex County, DE.

**1114**

## OPINION

McKELVIE, District Judge.

This is a contract case. The parties are Sussex County, Delaware ("the County") and several of its comprehensive general liability insurers, Harleysville Mutual Insurance Company ("Harleysville"), Maryland Casualty Company and its subsidiary Northern Insurance Company of New York (collectively "Maryland Casualty"), and the Home Insurance Company and the Home Indemnity Company (collectively "The Home").

In 1984, the United States Environmental Protection Agency ("EPA") detected the presence of volatile organic compounds at the County's Landfill No. 5. Thereafter, the EPA placed Landfill No. 5 on the Superfund National Priorities List, notified the County of its potential liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and encouraged the County to perform or finance voluntarily those response activities the EPA determines to be necessary at Landfill No. 5. The issue in this case is whether the insurers are obligated under their policies to defend the County against the EPA CERCLA proceeding and indemnify the County for sums it may become legally obligated to pay as a result of the EPA CERCLA proceeding.

The parties have completed discovery. Each of the insurers has moved for summary judgment that it has no duty under its policy to defend the County against the EPA proceeding or indemnify the County for sums it may become legally obligated to pay as a result of those proceedings. Additionally, Maryland Casualty has moved to certify a question of law to the Delaware Supreme Court. The County has moved for summary judgment that the insurers are obligated under their policies to defend the County against the CERCLA proceeding brought by the EPA to investigate and control the release or threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5.

On July 14, 1993, the Court heard oral argument on these motions. This is the Court's decision on the motions.

## FACTUAL BACKGROUND

In 1968, perceiving that open dumping and incineration of waste created health and safety hazards, the Delaware State Board of Health promulgated a new State Solid Waste Disposal Code ("the 1968 Code"). *See* Insurers' Joint Appendix, Docket Items 167–171 ("D.I. ___") at 718 ("JA–___"). Through the 1968 Code, the State Board of Health delegated to municipalities and counties the responsibility for providing facilities for the disposal of solid waste generated within their political jurisdictions.

In 1969, the County retained a consultant, Associated Delaware Engineers, Inc., to identify appropriate sites for six landfills and to prepare a plan for the construction and operation of each one.

In January of 1970, the County purchased a thirty-eight acre parcel of land near Laurel, Delaware. This property eventually became the site for the County's Landfill No. 5 (also known as the "Laurel Landfill"). The property is surrounded by farm fields to the west, east, and north and by a wooded lot to the south. Further to the north, there are approximately twenty-four residences. Underlying the property is an aquifer which surrounding property owners use for drinking water and other purposes. The soil beneath the property is permeable, fine to medium sand with gravel and occasional layers of silt and clay.

In February of 1970, the County submitted to the State an Application for Facility Approval and a Plan of Operations for Landfill No. 5. Associated Delaware Engineers prepared the Plan which was to serve as the blueprint for Landfill No. 5. In its Application for Facility Approval, the County stated that the landfill would be for household wastes only, that certain industrial and agricultural wastes could be received by special permit, but that "hazardous wastes" would not be accepted. *See* County Appendix, D.I. 179 at 219–220 ("B–___").

Also in February of 1970, the County requested bids from private contractors to operate the landfill. The County attached to its bid proposal form a sample "Agreement" which specifically referenced and required

compliance with the 1968 Code and the standards set forth in a 1968 United States Department of Health, Education, and Welfare ("HEW") publication titled *Sanitary Landfill Facts*. *Sanitary Landfill Facts* contained one paragraph on the topic of water pollution at sanitary landfills which reads in pertinent part:

> [I]f a sanitary landfill is intermittently or continuously in contact with ground water, the ground water can become grossly polluted and unfit for domestic or irrigational use. Proper planning and site selection, however, combined with good engineering design and operation of the sanitary landfill can normally eliminate the possibility of either surface or ground water pollution.

JA–1324.

By letter of March 20, 1970, the Delaware State Board of Health granted approval to the County to dispose of solid waste at Landfill No. 5, subject to ten conditions. Among those conditions were the following:

> 1. Disposal shall be by sanitary landfill in accordance with [the 1968 Code]. Any contract written between Sussex County and any private contractor who would operate the landfill shall clearly establish Delaware State Board of Health standards on the operation of the fill, as binding....
>
> ....
>
> 3. The estimated high ground water elevation shall be as being at elevation seven (7) feet above the reference datum utilized on the Plan of Operations and profile one (1) shall identify this level as the water table level.
>
> 4. A minimum of two (2) feet of clearance shall be maintained between the minimum elevation of refuse deposits and the anticipated high ground water elevation....

JA–738.

The 1968 Code referenced in the first condition in the State's letter of approval required, *inter alia,* that:

> 1. Individual refuse cells "shall be no greater than eight feet in depth."

> 2. At least six inches of cover material shall be placed over all refuse "at least by the end of each working day."
>
> 3. Final cover over completed cells compacted to a minimum thickness of two feet shall be placed "by the end of the working day" on each completed cell.

JA–727.

On May 11, 1970, the County opened Landfill No. 5. From May 11, 1970, to March 31, 1973, Sussex Sand and Gravel, Inc. ("Sussex Sand and Gravel") operated the landfill under three consecutive one year contracts with the County. The County, in conjunction with Sussex Sand and Gravel and future "operators," ran Landfill No. 5 as follows. First, to ensure that hazardous wastes were not deposited at the landfill, a County Gatekeeper would inspect incoming loads of waste. After the Gatekeeper inspected and cleared an incoming load, the waste would be brought into the landfill and dumped into a cell which had been excavated by the operator. The operator would then compact and level the trash within the cell.

In 1970, the County purchased a comprehensive general liability ("CGL") insurance policy from Maryland Casualty. That policy was effective from June 3, 1970, to June 3, 1973.[1]

On June 30, 1970, Frederic L. Stiegler, Jr., a State Board of Health employee, inspected Landfill No. 5. He noted that "the facility is being operated in a manner which is consistent with the solid waste disposal code regulations by the operator...." and concluded that "[g]enerally the overall operation appears to comply completely with the requirements of the [1968 Code]." B–224.

On April 29, 1971, Mr. Stiegler again inspected Landfill No. 5, this time with another Board of Health Employee, Robert R. King. Mr. Stiegler noted the following problems at Landfill No. 5: (1) the operator of the landfill reported that a water table problem had occurred and that the water table was observed to be approximately four feet from the surface of the ground; (2) a rodent prob-

---

**1.** Apparently this policy was actually a series of three one-year policies requiring renewal by Maryland Casualty and installment payments each year by the County to continue coverage.

lem had developed; and, (3) there was a "small problem" with blowing paper. B–225.

In 1973, the County purchased a second CGL policy from Maryland Casualty. That policy was effective from June 3, 1973 to June 3, 1976.

From April 1, 1973 to August 11, 1979, the Hudson Transfer & Construction Co. ("Hudson") operated the landfill under two consecutive three year contracts. During that time, John Argo, the County Supervisor of Landfill No. 5, wrote to Hudson approximately thirty times advising it that "a suitable layer of cover material had not been placed over all the refuse deposited at the landfill." See, e.g., JA–764.

In March of 1974, the Delaware Department of Natural Resources and Environmental Control ("DNREC") proposed new regulations governing sanitary landfills (Delaware Solid Waste Disposal Regulations, hereinafter "1974 Regulations"). DNREC intended these regulations to replace and expand upon the 1968 Code. Among other things, the proposed regulations required owners and operators of landfills to collect, treat, and dispose of leachate and to line disposal areas and leachate collection ditches with an impermeable liner. The proposed regulation contained an exception to the liner requirement for owners or operators who could prove to DNREC that the natural soil at the landfill site was impermeable.

On April 23, 1974, Roger Truitt, a civil engineer for the County, presented a memorandum to the County Council at a public hearing on the proposed regulations. In the memorandum, he outlined the new requirements in the proposed regulations and projected the costs for County compliance with these regulations. Mr. Truitt noted that the leachate collection requirements would have a tremendous economic impact on the County. Based on a 1973 cost of approximately $3.62 per ton of solid waste to operate and maintain the six County landfills, Mr. Truitt estimated that the leachate collection, treatment, and disposal requirements would increase costs by $2.00–4.00 per ton. He also noted the following about these leachate requirements:

All things considered, the state of the art of leachate collection, treatment and disposal leaves quite a bit to be desired at this point in time. [Leachate collection, treatment, and disposal] is recognized to be a temporary alternative aimed at lessening the potential of contamination of the groundwater that may serve as a water supply. However, it is a costly alternative that, once pursued, could lock the County into a less than best available means of solid waste disposal.

JA–1433. Mr. Truitt testified at the hearing that "at present, there is no substantiated evidence that leachate contamination of ground or surface waters is occurring in Sussex County." JA–1437.

In August of 1974, DNREC adopted the 1974 Regulations which became effective immediately except that they allowed a two year grace period for compliance. The 1974 Regulations' requirements as to ground and surface water protection read as follows:

All leachate shall be collected and treated so as to provide a degree of removal of pollutants reflecting the application of a practicable level of technology. All disposal areas and leachate collection ditches and ponds shall be lined with an impermeable liner. A synthetic impermeable liner shall be installed unless the applicant can prove to the satisfaction of the Department that a natural soil liner is impermeable. All treated leachate shall be disposed of in accordance with the Department's Regulations Governing the Control of Water Pollution. The Department may consider various systems for collecting, treating and recycling leachate as the state of the art technology develops. Wells or other monitoring devices shall be installed and maintained to determine the initial characterization of the water quality and directions of groundwater flow and to detect changes in these conditions during the operation of the landfill. At least three feet of separation between refuse deposits and the estimated yearly high groundwater table level shall be maintained. The refuse file shall be kept a minimum of 100 feet from all surface waters. Operations shall be planned and conducted so rainwater is

drained off the fill or disposal area at all times. Standing water shall not be allowed on the fill at any time. The completed fill shall have a minimum slope of 2% to facilitate surface drainage and a maximum slope that precludes erosion.

JA–623–624. Section 3.06 of the Regulations addressed the applicability of the Regulations to existing sites:

All persons shall within 90 days after promulgation of this Regulation submit a statement to the Department indicating those parts of this Regulation with which they are not in compliance. Existing permitted solid waste disposal sites which are operating in any manner inconsistent with the objectives, standards and methods established by this Regulation are required to upgrade operations to meet the requirements of this Regulation and the permittee shall submit plans for upgrading operations within a period of six months after adoption by the Secretary.... The permittee shall be in compliance within a period of 24 months after adoption of this regulation.

JA–617–18. It appears that after DNREC adopted the Regulations, the County did not line new cells at existing landfill sites because it thought that if leachate contamination had already occurred, lining new cells would not prevent leachate migration from the old cells. It also appears that in this time period a frequent point of discussion between existing landfill operators and DNREC officials was whether it was practical to dig up an existing landfill to put a liner underneath it. JA–531.

On June 9, 1975, William C. Henry, the County Engineer from 1970 to 1976, wrote to Oliver Hitchens at Sussex Sand & Gravel to notify him the County had "recently discovered" that Sussex Sand & Gravel had failed to fully comply with the final cover requirements in its contract with the County. Specifically, Mr. Henry noted that an area of the landfill that had been filled during the period of the contract (1970–1973) was covered with only six inches, rather than the required two feet, of final cover material. Mr. Henry requested that Sussex Sand & Gravel provide additional cover in accordance with the terms of the contract. JA–910.

In a November 10, 1975, letter to John C. Bryson, Secretary of DNREC, Ralph E. Benson, President of the County Council, requested that DNREC waive the portion of the 1974 Regulations that required leachate collection and treatment measures until such time as the Delaware Solid Waste Authority prepared its policies and programs related to leachate collection. JA–902. The State later denied this request.

In an August 27, 1976, memorandum Fred McKee (then Assistant County Administrator) advised Joseph Conway (County Administrator) that as of August 1, 1976, the entire County landfill system was in violation of the 1974 Regulations because the County landfills did not have leachate collection and treatment facilities. He further advised that it would probably cost $1,000,000 to bring the County landfills into compliance. JA–1275–76.

In December of 1976, the County began threatening to withhold payments from Hudson in an effort to force it to comply with the daily cover requirements of the 1968 Code.

In 1976, the County purchased a third CGL policy from Maryland Casualty. That policy was effective from June 3, 1976 to June 3, 1979.

In 1978, pursuant to DNREC's requirements, the County hired Roy F. Weston, Inc., ("Weston") as its environmental consultant, to conduct a quarterly groundwater monitoring program to evaluate the impact of the landfills on groundwater quality.

On June 15, 1979, Mr. Argo wrote to Wayne Hudson, and advised him that portions of the landfill had an insufficient depth of final cover material. JA–786.

On August 11, 1979, the County closed Landfill No. 5 for lack of space. On August 13, 1979, the County opened a solid waste transfer station for municipal wastes on the site of Landfill No. 5. Thereafter, pursuant to a DNREC requirement, the County installed five monitoring wells at Landfill No. 5.

In September and November of 1979, Weston took samples of groundwater at Landfill No. 5. In February of 1980, Weston issued a report titled *Preliminary Hydrogeological Evaluation of Six Landfills in Sussex County, Delaware.* In this report, Weston advised the County that samples taken at Landfill No. 5 indicated that leachate was escaping from the landfill and contaminating the underlying groundwater. It also advised the County that some of the refuse in the landfill was located below the water table, thereby directly contaminating the groundwater with leachate.

In 1981, Weston conducted additional sampling at Landfill No. 5. In December of 1982, it issued a report titled *Preliminary Evaluation of the Potential Impact on Ground Water and Surface Water of Six Landfills in Sussex County, Delaware.* In this report, Weston advised the County that the tests now indicated groundwater contamination in three of the five on-site monitoring wells.

In 1982, the County purchased a CGL policy from The Home. That policy was to be effective from June 3, 1982, to June 3, 1985, however, the County cancelled the policy as of April 30, 1984, and purchased a CGL policy from Harleysville effective from April 30, 1984, to April 30, 1985. The County renewed the Harleysville CGL policy each year through April 30, 1992.

In October of 1983, Weston took samples from seventeen domestic groundwater wells near the landfill. The results of the samples demonstrated "wells in the vicinity of the landfill show no indication of contamination from [Landfill No. 5]." A–1353.

In December of 1984, the EPA conducted a site inspection and discovered that benzene and other volatile organic compounds were present at Landfill No. 5.

From 1983 to 1989, sampling conducted by Weston and reported to the County indicated groundwater contamination at Landfill No. 5, but did not indicate contamination of any of the nearby residential wells.

By letter of September 15, 1988, the County notified Maryland Casualty that Landfill No. 5 might be placed on the EPA's National Priorities List and requested that Maryland Casualty provide the County a defense against the administrative proceeding brought by the EPA to investigate and control the release or threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5.

In April of 1989, Weston issued a report titled *Groundwater Management Investigations for Omar and Laurel Landfills, Sussex County, Delaware.* In this report, Weston noted that its testing revealed that most of the monitoring wells at the landfill and all of the residential wells near the landfill were clean of volatile organic compounds.

In its August 1989 quarterly sampling, Weston tested eighteen residential wells and found contamination in the Joseph Well. In October of 1989, Weston reported its discovery to the County.

Also in October of 1989, the EPA placed Landfill No. 5 on the Superfund National Priorities List.

In April of 1990, the EPA sent the County a "General Notice" letter announcing that the EPA had "documented the release or threatened release of hazardous substances ... at [Landfill No. 5]," advising the County that it might be a potentially responsible party under CERCLA, and requesting that it perform or finance voluntarily those response activities the EPA might determine to be necessary at the landfill. County Appendix, D.I. 145 at 294 ("A–___").

In May of 1990, the EPA sent a "Special Notice" to the County encouraging it to voluntarily negotiate a settlement to perform or finance the response activities required at Landfill No. 5. The Notice advised the County that the EPA would not engage in response activities for a period of sixty days provided the County submitted to the EPA a good faith offer to conduct the Remedial Investigation/Feasibility Study ("RI/FS") or finance its performance by the EPA. A–297.

By letter of July 11, 1990, the County notified The Home of the EPA action at Landfill No. 5 and requested that The Home provide the County a defense against the administrative proceeding brought by the EPA to investigate and control the release or

threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5. JA–1439.

On March 29, 1991, the County signed an Administrative Order on Consent with the EPA in which it agreed to perform a RI/FS for Landfill No. 5 and reimburse the EPA for costs the EPA incurred investigating the landfill. A–363. Pursuant to the Administrative Order on Consent, the Remedial Investigation should characterize the geology and hydrogeology of the site, determine the nature and extent of the contamination at or from the site, and characterize all ecological zones, including terrestrial riparian wetlands, aquatic/marine, and transitional zones. The Feasibility Study should determine and evaluate alternatives for remedial action to prevent, mitigate or otherwise respond to or remedy the release or threatened release of hazardous substances, pollutants, or contaminants at or from the site.

By letter dated August 19, 1991, the County notified Harleysville of the EPA action at Landfill No. 5 and requested that Harleysville provide the County a defense against the administrative proceeding brought by the EPA to investigate and control the release or threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5. A–852.

On March 13, 1992, Harleysville filed the complaint in this action seeking a declaration that under its contracts with the County, it has no obligation to defend the County against the EPA CERCLA proceeding or indemnify the County for sums it may become legally obligated to pay as a result of that proceeding. *See The Harleysville Mutual Insurance Company, Inc. v. Sussex County, Delaware,* C.A. No. 92–144–RRM. The County answered Harleysville's complaint and asserted a counterclaim seeking a declaratory judgment that Harleysville is legally obligated to defend it against the actions asserted by the EPA in the CERCLA proceeding, reimburse it for defense costs the County has incurred in complying with the EPA's requests, and indemnify it for sums it may become legally obligated to pay as a result of the EPA's CERCLA proceeding. Thereafter, the County filed complaints

for declaratory judgments against two of its other insurers, The Home and Maryland Casualty, seeking defense costs and indemnification for sums it may become legally obligated to pay as a result of the actions initiated by the EPA at Landfill No. 5. *See Sussex County, Delaware v. Maryland Casualty Company and Northern Insurance Company of New York,* C.A. No. 92–289–RRM; and *Sussex County, Delaware v. The Home Insurance Company and The Home Indemnity Company,* C.A. No. 92–513–RRM.

## DISCUSSION

### I. Duty of the Insurers to Indemnify the County

#### A. The Home and Harleysville Policies

The County seeks a declaratory judgment that under policy number IST–P185936, a CGL policy in effect from June 3, 1982, to April 30, 1984, The Home must defend it against the actions asserted by the EPA in the CERCLA proceeding, reimburse it for defense costs the County has incurred and will incur in complying with the EPA's requests, and indemnify it for sums it may become legally obligated to pay as a result of the EPA's CERCLA proceeding. The County seeks a declaratory judgment that under policy number MPA 1A 56 42, a CGL policy in effect from April 30, 1984, to April 30, 1985, Harleysville must defend it against the actions asserted by the EPA in the CERCLA proceeding, reimburse it for defense costs the County has incurred in complying with the EPA's requests, and indemnify it for sums it may become legally obligated to pay as a result of the EPA's CERCLA proceeding. (The County originally sought a declaratory judgment that Harleysville defend and indemnify it under the Harleysville policies in effect from 1984 to 1992, however, the County has since abandoned its claims under each of the Harleysville policies, except the policy issued on April 30, 1984).

The Home and Harleysville have each moved on several grounds for summary judgment that they are not obligated under their policies to indemnify the County for liability it may incur as a result of the EPA's CERCLA proceeding. The Home's policy, issued

in 1982, and Harleysville's policy, issued in 1984, provide comprehensive general liability insurance in substantially the same contract terms:

> The company will pay on behalf of the Insured all sums which the insured shall become legally obligated to pay as damages because of
>> bodily injury or
>>
>> property damages
>
> to which this insurance applies, caused by an occurrence. . . .

The policies define "occurrence" as:

> an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected or intended from the standpoint of the Insured.

The policies define "property damage" as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

Each policy also has a number of "exclusions" from coverage. The exclusion relevant to this dispute is the "pollution exclusion." The Home and Harleysville have identical "pollution exclusion" clauses in the policies at issue. The clause reads as follows:

> The insurance does not apply . . . to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

The Home has moved for summary judgment that it has no duty to indemnify the County under its policies on the grounds that: (1) no "property damage" occurred during The Home's policy periods; (2) there was no "occurrence" under the policy as the County expected or intended the groundwater underlying Landfill No. 5 to be contaminated; and, (3) the pollution exclusion clause in The Home's policy bars coverage for the County. Harleysville has moved for summary judgment that is has no duty to indemnify the County under its policy on the grounds that: (1) there was no "occurrence" under the policy as the County expected or intended the groundwater underlying Landfill No. 5 to be contaminated; (2) the pollution exclusion clause in Harleysville's policy bars coverage for the County; and, (3) the County breached the notice provision contained in Harleysville's policy which requires that the County provide written notice to Harleysville of an occurrence as soon as practical after the occurrence becomes known to the County Finance Director.

For the reasons set forth below, the Court finds that The Home and Harleysville are entitled to summary judgment on the ground that the pollution exclusion clauses in their respective policies bar coverage for the County. Accordingly, the Court need not address these insurers alternative arguments.

■ The pollution exclusion clause forecloses coverage for damage resulting from the discharge of various contaminants and pollutants unless the discharge was "sudden and accidental." The meaning of the word "sudden" has been the subject of extensive litigation throughout the country. Some courts have found that it is unambiguous and has a temporal component requiring an "abrupt" or "brief" discharge, while other courts have found that it is ambiguous and have construed it to mean "unexpected." *Compare American Motorists Ins. Co. v. General Host Corp.,* 667 F.Supp. 1423 (D.Kan.1987), *aff'd* 946 F.2d 1482 (10th Cir. 1991), *with Outboard Marine Corp. v. Liberty Mut. Ins. Co.,* 154 Ill.2d 90, 180 Ill.Dec. 691, 607 N.E.2d 1204 (Ill.1992). The parties agree that Delaware law governs this dispute and, in applying Delaware law, this court and the United States Court of Appeals for the Third Circuit have found that "sudden and accidental" is ambiguous and have predicted that the Delaware Supreme Court would find that "sudden and accidental" means "unex-

pected and unintended." *See New Castle County v. Hartford Accident and Indem. Co.*, 673 F.Supp. 1359 (D.Del.1987) (*"New Castle I"*); *New Castle County v. Hartford Accident and Indem. Co.*, 933 F.2d 1162, 1198–99 (3d Cir.1991) (*"New Castle V"*). Accordingly, in addressing the insurers' pollution exclusion clause argument, the Court will construe "sudden and accidental" to mean "unexpected and unintended."

■ The Home and Harleysville contend that the property damage in this case arose out of the discharge of leachate, a contaminant[2], from Landfill No. 5. Consequently, they argue the pollution exclusion clause bars coverage for the County unless the County can show that this discharge falls within the "sudden and accidental" exception to the exclusion. They further argue the County cannot make this showing because the County knew in February of 1980, prior to purchasing policies from The Home and Harleysville, that the landfill was discharging leachate and, therefore, the discharge of leachate at Landfill No. 5 cannot be considered "unexpected or unintended." *See New Castle County v. Hartford Accident and Indem. Co.*, 970 F.2d 1267, 1273 (3d Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993) (*"New Castle VII"*) (New Castle County denied coverage because it expected that one of its landfills would discharge leachate).

The County concedes that it knew, prior to purchasing policies from The Home and Harleysville, that the landfill was discharging leachate. It argues, however, that it did not know that the landfill was discharging benzene and other volatile organic compounds until December of 1984, after it had purchased policies from The Home and Harleysville, and that it is the knowledge of the discharge of these organic compounds that is relevant for purposes of applying the pollution exclusion clause because the liability confronting the County in the CERCLA proceeding is for the release of "hazardous substances" or "toxic chemicals." The County

further argues that because it affirmatively prohibited the disposal of toxic chemicals at Landfill No. 5, it could not have expected and intended to discharge these chemicals until after they were discovered at the landfill in December of 1984.

For the following reasons, the Court finds that the County's arguments lack merit and that The Home and Harleysville are entitled to summary judgment that they have no duty to indemnify the County for liability it may incur as a result of the EPA's CERCLA proceeding. First, the Court rejects the County's attempt to distinguish benzene and other volatile compounds from leachate for purposes of applying the pollution exclusion clause. The EPA has not limited its cleanup activities at Landfill No. 5 to "hazardous substances" or "toxic chemicals." In its General Notice letter to the County, the EPA stated:

> "The [EPA] has documented the release or threatened release of hazardous substances, *pollutants or contaminants* at [Landfill No. 5]. EPA has spent or is considering spending public funds on actions to investigate and control releases or threatened releases at the Site."

A–294 (emphasis added). As noted above, the County has not argued that leachate is not a contaminant. Furthermore, to the extent the County argues that benzene is, but leachate is not, a "hazardous substance" under CERCLA, it is mistaken. Sampling results from August, 1980 testing at the landfill revealed the presence of zinc, copper, and arsenic in the leachate under the landfill. As these metals are "hazardous substances" for CERCLA purposes, 40 C.F.R. § 302.4, the leachate under the landfill has been a "hazardous substance" at least since 1980. *See B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1200 (2nd Cir.1992) ("[w]hen a mixture or waste solution contains hazardous substances, that mixture is itself hazardous for purposes of determining CERCLA liability").

Second, although the County apparently did not permit the disposal of chemical

---

**2.** As was the case in the *New Castle County* litigation, Sussex County does not contend that leachate is not a contaminant. *See New Castle County v. Hartford Accident and Indem. Co.*, 970

F.2d 1267, 1269 (3d Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993) (*"New Castle VII"*).

wastes at Landfill No. 5, that fact is irrelevant for purposes of applying the pollution exclusion clause in the policies issued by The Home and Harleysville. As the Third Circuit noted in *New Castle VII:*

> Moral culpability is irrelevant in the economic scheme of things. Should the holy water later turn out to be a witches brew, as it did here, New Castle [County] bears the risk of damage from the innocent but intentional act of pollution as that risk has been allocated by the parties and embodied in the pollution exclusion clause.

970 F.2d at 1272.

In sum, the County knew as of February, 1980, prior to the issuance of The Home's or Harleysville's policy, that Landfill No. 5 was discharging leachate. Accordingly, the discharge of this contaminant cannot be considered "unexpected and unintended" and, therefore, the pollution exclusion clause in each of these policies precludes coverage for the County. *See New Castle VII,* 970 F.2d at 1273.

### B. *Maryland Casualty's Policies*

The County seeks a declaratory judgment that under three comprehensive general liability policies, policy number 41-168965, effective June 3, 1970, to June 3, 1973, policy number 41-208731 effective June 3, 1973, to June 3, 1976, and policy number SM-0656-0750, effective June 3, 1976, to June 3, 1979, Maryland Casualty must defend it against the actions asserted by the EPA in the CERCLA proceeding, reimburse it for defense costs the County has incurred and will incur in complying with the EPA's requests, and indemnify it for sums it may become legally obligated to pay as a result of the EPA's CERCLA proceeding. Each of the three Maryland Casualty policies read:

> The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence and arising out of the ownership, maintenance or use of the insured premises....

The 1970–73 policy defines an "occurrence" as:

> an accident, including injurious exposure to conditions which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The 1970–1973 policy defines "property damage" as: "injury to or destruction of tangible property."

The 1973–76 and 1976–79 policies define "occurrence" as:

> an accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The 1973–1976 and 1976–1979 policies define "property damage" as:

> (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

The 1970–1973 policy did not contain a pollution exclusion clause, however, the 1973–1976 and 1976–1979 policies did contain a pollution exclusion clause.

Maryland Casualty has moved for summary judgment that it has no duty to indemnify the County under its policies on the grounds that: (1) remediation costs incurred by the County in response to the EPA action are mere economic losses and not recoverable third party damages under the policies; (2) the policies were not "triggered" as no property damage occurred during the policy periods; (3) the pollution exclusion clauses in the 1973–76 and 1976–79 policies preclude coverage for the County during those years; and (4) there was no "occurrence" during the relevant policy periods.

#### 1. *Economic losses versus covered third party damages*

In its first argument for summary judgment, Maryland Casualty contends that costs incurred pursuant to government regulations relating to environmental cleanup are not compensable under CGL policies, unless

the government entity compelling the cleanup actually owns the property that is contaminated. Maryland Casualty further contends that if the government entity does not own the property, the insured's costs in paying for, or performing a cleanup, are mere economic losses and do not constitute third party property damage within the meaning of a CGL policy. In support of this argument, Maryland Casualty relies primarily on *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 330 Md. 758, 625 A.2d 1021 (1993) and *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir.1986). Both cases involved CGL policies containing the following language also present in Maryland Casualty's policies:

> The Company shall pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies....

In *Bausch & Lomb*, the insured, in conjunction with the Maryland Waste Management Administration, undertook to clean up contaminated groundwater on its own property. As there was no evidence of damage to a third party's property, the court looked to whether the State of Maryland had a proprietary interest in the groundwater underlying the insured's property. Finding that it did not, the court held "that in the absence of third party property damage [the insurer] was not obliged by the standard terms of the CGL contract to pay [the insured's] abatement expenses incurred at the State's behest." *Bausch & Lomb*, 330 Md. at 788, 625 A.2d at 1036 (Md.1993). Similarly, in *Mraz*, the court held that an insurer need not indemnify an insured under a CGL policy for cleanup costs incurred by the EPA because the EPA had not sustained property damage. *Mraz*, 804 F.2d at 1329.

Applying *Bausch & Lomb* and *Mraz* to the facts of this case, Maryland Casualty argues that because the government entity seeking cleanup in this case (the EPA) does not own the contaminated groundwater underlying or near Landfill No. 5, the County is not entitled to coverage under its Maryland Casualty CGL policies.

The Court rejects Maryland Casualty's argument for two reasons. First, *Bausch & Lomb* is distinguishable as the contaminated groundwater in that case had apparently not moved off the insured's property and there was no evidence of third party property damage. In contrast, there is evidence in this case that the groundwater from Landfill No. 5 has moved off the County's property and contaminated a residential well. Second, and more importantly, to the extent *Bausch & Lomb* stands for the proposition established in *Mraz* that CGL policies do not cover environmental response costs unless the government entity initiating such efforts has a property interest at stake, this court in applying Delaware law to an environmental coverage dispute has previously rejected that proposition. *See New Castle I*, 673 F.Supp. at 1366:

> The Insurers also contend that a government suit for response costs under CERCLA is not covered by the policies because the government did not suffer "property damage." The insurers cite the Fourth Circuit decision in *Mraz v. Canadian Universal Ins. Co.*, 804 F.2d 1325 (4th Cir. 1986) for support. In *Mraz*, the Court held that insurers need not indemnify the insured for a suit brought by federal and state government entities because the government entities suffered no property damage. The Court found that the plaintiff's claim for cleanup costs was only a claim for an economic loss, and that the relevant policies did not cover economic losses.

> This Court disagrees with the holding and reasoning of *Mraz*. To trigger coverage under the policies, the Federal Government ... need not allege that it suffered property damage. Under the terms of the policy, the underlying claim need only require the insured "to pay damages *because of* ... property damage."

Furthermore, in considering this court's rejection of the reasoning of *Mraz*, the United States Court of Appeals for the Third Circuit noted:

> We have little to add to this analysis. The EPA ... sought to recover from the County past and future sums necessary to remedy damage to neighboring property as a

result of the migration of leachate from the ... landfill. The County's ultimate liability ... is quite literally "because of ... property damage."

*New Castle V,* 933 F.2d at 1191, n. 57.

As this court and the Third Circuit have rejected under Delaware law the very argument Maryland Casualty advances in this case, the Court will follow *New Castle I* and *New Castle V* and find that, as the response activities encouraged by the EPA pursuant to CERCLA require the County to pay damages "because of property damage," the coverage afforded by Maryland Casualty's policies may have been triggered.

### 2. *Policies were not "triggered" as no property damage occurred during the policy period*

 Maryland Casualty also argues that the County is not entitled to coverage under any of Maryland Casualty's policies because none of the policies were "triggered" by property damage that occurred during the policy period. The 1970–73 policy defines an "occurrence" as:

> an accident, including injurious exposure to conditions which results, *during the policy period,* in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

(emphasis added). The 1970–1973 policy defines "property damage" as: "injury to or destruction of tangible property."

The 1973–76 and 1976–79 policies define "occurrence" as:

> an accident, including continuous or repeated exposure to conditions which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

The 1973–1976 and 1976–1979 policies define "property damage" as:

> (1) physical injury to or destruction of tangible property which occurs *during the policy period,* including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or de-

stroyed provided such loss of use is caused by an occurrence during the policy period. (emphasis added).

Maryland Casualty argues that because it was not until 1989, over ten years after the end of Maryland Casualty's last policy period, that any third party property damage occurred (the August 1989, Weston samples showed contamination of the Joseph Well), the County cannot meet its burden of proving that property damage occurred during the years 1970–1979, thereby "triggering" any of Maryland Casualty's policies.

Maryland Casualty's argument is inconsistent with Delaware law regarding the "trigger" of coverage. In comparing the slow leaching of pollutants from a landfill to adjacent property, to a disease like asbestosis which inflicts progressive bodily injury, this court has concluded that just as it is impossible to identify a precise point in time when an individual suffers bodily injury from a progressive disease, it is impossible to identify a precise point in time when property damage occurs from the leaching of pollutants. *New Castle County v. Continental Casualty Co.,* 725 F.Supp. 800, 809–13 (D.Del.1989) ("New Castle III"), *aff'd in part and rev'd in part,* 933 F.2d 1162 (3d Cir. 1991) ("it would be impossible in this case to determine when the first molecule of contaminant damaged neighboring property."). Accordingly, the court in *New Castle III* applied the "continuous trigger" theory of coverage whereby "every policy, from the start of the injurious process, is triggered." *Id.* at 813. In *National Union Fire Ins. Co. v. Rhone–Poulenc Basic Chems. Co.,* Del.Super. C.A. No. 87C–SE–11 (Jan. 16, 1992) at 53–54, 1992 WL 22690, the Delaware Superior Court adopted the "continuous trigger" theory as applied to an insurance coverage dispute relating to the discharge of contaminants from a landfill.

Applying the continuous trigger theory to the facts of this case, the Court finds that there remain issues of fact relating to the start of the injurious process. That is, when did leachate begin to migrate off the County's property? Although testing by Weston did not reveal contamination of third party property until 1989, the insurers themselves

have argued that the geologic conditions at Landfill No. 5 were sufficient to foster the development of leachate contamination of the groundwater immediately upon the beginning of landfill operations in 1970. *See, e.g.,* The Home's Brief in Support of its Motion for Summary Judgment on the Ground that Contamination of Groundwater Underlying the Laurel Landfill was a Known Event or "Expected or Intended" by the Insured, Sussex County, Prior to the Issuance of The Home's Policy in 1982. D.I. 149 at 7, 10–11. In addition, Michael A. Izzo, an Assistant County Engineer, testified that leachate contamination of the groundwater might have started from "day one." A–351. As there remain issues of fact as to when leachate migration began at Landfill No. 5, the Court finds summary judgment on this issue is inappropriate.

### 3. *Pollution exclusion clause*

Maryland Casualty's 1970–73 policy did not contain a pollution exclusion clause. However, Maryland Casualty contends the pollution exclusion clauses in its 1973–1976 and 1976–1979 policies preclude coverage for the County under those policies. The pollution exclusion clause in these policies reads as follows:

> This insurance does not apply ... to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon the land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

■ Maryland Casualty advances two distinct arguments in support of its contention that the pollution exclusion clause bars coverage for the County. First, it argues the clause bars coverage because the County expected and intended to discharge *waste* at the landfill and that waste subsequently contaminated the groundwater. Essentially, Maryland Casualty argues that the County denied itself coverage under Maryland Casualty's latter two policies by operating a landfill, which literally involved discharging waste into the land.

Maryland Casualty's argument has been rejected as a matter of Delaware law. In a well reasoned opinion, Judge Poppiti held that disposal of wastes at a landfill would not bar coverage for the insured under a pollution exclusion clause. *See National Union Fire Ins. Co. of Pittsburgh v. Rhone–Poulenc Basic Chems. Co.,* Del.Super. C.A. No. 87C–SE–11 (Jan. 16, 1992) 47, 1992 WL 22690 (Although the insured "may have disposed of its wastes at the landfill ... [this] does not demonstrate [the insured] expected or intended to discharge a pollutant into or upon the land....").

■ Second, Maryland Casualty argues that coverage is barred under its 1973–1976 and 1976–1979 policies because the County expected and intended to discharge *leachate* from the landfill. As the Maryland Casualty policies were in effect prior to February of 1980, the time the County acquired conclusive knowledge that the landfill was discharging leachate, Maryland Casualty points to several facts it contends demonstrate that the County actually expected prior to 1980 that the landfill would discharge leachate. In sum, Maryland Casualty alleges the County designed and operated Landfill No. 5 in violation of the 1968 Code and the 1974 Regulations and that County employees expected that these violations would result in the landfill discharging leachate. The following is a discussion of the factors relied upon by Maryland Casualty in support of its argument. As mentioned below, the Court finds there remain genuine issues of material fact as to each of Maryland Casualty's arguments allegedly demonstrating the County expected, prior to 1980, that the landfill would discharge leachate.

Maryland Casualty alleges the County designed Landfill No. 5 so that the individual refuse cells would be dug deeper than the eight feet maximum allowed by the 1968 Code, thereby allowing waste to be placed directly into contact with the groundwater. In support of this argument, Maryland Casualty relies on a diagram prepared by Associated Delaware Engineers as the County's Plan of Operations. This diagram shows a cross section of a typical cell at the landfill

which includes alternating layers of three feet of waste material and six inches of cover material. By adding up the vertical dimensions for waste and cover material as shown in the diagram, Maryland Casualty concludes that the cells were designed to be thirteen feet deep, five feet deeper than the maximum allowed by the 1968 Code. However, Joseph Plotts, the engineer who supervised the preparation of the Plan of Operation for Landfill No. 5, testified that you cannot add up the vertical dimensions on the diagram to arrive at a figure for the depth of the cells.

> Q: So this cross section, then, represents, with it representing four separate layers of solid waste—would represent a depth of— let's see. Three feet and three feet and let's say the last two levels are both two feet. That would be ten feet. With 36-inch fills in between, we are talking approximately eleven and a half feet. Is that correct?
>
> A: No.
>
> Q: Okay. How would you correct me?
>
> A: If you note that this drawing has a diagonal slash across it, that's meant to mean that this is the top and the bottom, or the bottom and the top of a typical cell.
>
> Q: Okay.
>
> A: That's the reason why there was no dimension on that one spot, because that could be anything.
>
> Q: Okay.
>
> A: You cannot add them up this way.

B–138–39.

Moreover, Wayne Hudson testified that the depth of actual excavations at the landfill was not determined by adding up the measurements on the "typical cell" diagram:

> Q: Do you have any knowledge as to how your operators dug the cells? Did they do it in accordance with this plan of operations, or did they—
>
> A: I would say basically. But as this says, it is a typical cell. I would assume you are talking about twelve foot. I would say there's places over there you couldn't go twelve foot.
>
> Q: Because you would hit the water table?
>
> A: Right.

> Q: So some of the cells are shallower?
>
> A: I would assume so.

B–73A.

As further support for its argument that the County dug refuse cells to depths exceeding eight feet, Maryland Casualty points to Weston's 1993 Remedial Investigation Report which shows that waste was deposited at Landfill No. 5 in depths ranging from 10 to 14 feet. JA–892. As the County points out, this report does not conclusively demonstrate that the County dug cells deeper than eight feet because the County's Plan of Operations contemplated that waste and cover material would be filled in above grade as it existed in 1970. Thus, a portion of the 10 to 14 foot depths recorded in Weston's report might consist of layers of waste and cover piled on top of the 1970 ground level.

Maryland Casualty asserts the County designed Landfill No. 5 to violate the two foot buffer requirement in the 1968 Code. In support of this contention, Maryland Casualty cites the Plan of Operations which it claims identifies, as of February 1970, the water table levels in each of the twelve proposed waste cells across the landfill. Based on its assumption that the cells were designed to be thirteen feet deep, Maryland Casualty argues that because the water level recorded in eleven of the twelve cells is less than fifteen feet below the soil surface, the County designed those eleven cells to be deeper than or within two feet of the depth of the water table level.

The County has come forward with evidence to rebut Maryland Casualty's contention that the design of the landfill violated the two foot buffer requirement. For example, the "typical cell" diagrams prepared by Associated Delaware Engineers show a hypothetical cell with a water table level at 27.7 feet of elevation and a cell beginning two feet higher, at an elevation of 29.7 feet. Furthermore, Mr. Plotts testified that he understood the importance of the two foot buffer requirement:

> Q: Do you recollect the importance of determining the groundwater level in regard to the Plan of Operations?

A: It was the crux to the whole landfill operation, i.e., no solid waste may be deposited deeper than that shown on the plan, which is two feet above the water table.

B–133.

Additionally, the County asserts the water table data relied upon by Maryland Casualty does not represent water table depths for proposed "cells", rather it represents water table depths at various points on the perimeter of the landfill. As to the operation of the landfill, Mr. Henry, the former County Engineer, testified that if an operator did reach the water table level in excavating a cell, he was told to "refill that area and compact it until they were two feet above that elevation." JA–295.

Next, Maryland Casualty argues the County failed to perform testing to determine the high water table underlying the landfill. Rodney Wyatt, a former County engineer, explained the importance of using the high water table:

[T]he water table actually varies at different times. So unless you were actually digging the cells at its highest point, it is very possible that because you have got a change in contour there, you were keeping the bottom of the cell level, and because the water table contour changed, that the operator who thought he was doing the correct construction of the cells had no reason to believe that he was in the water table. And then what probably happened is that when the water table would rise in the winter months, when we did the sampling to determine, you know, the gradient of the water table, that it was at its highest point.

JA–579. The County conducted testing in February of 1970 to determine the water table levels at the landfill, however, Maryland Casualty argues that this testing would not reveal the highest water table levels, as those levels are reached in the area of Landfill No. 5 between March and May.

The County asserts that it understood February to be the season of high groundwater near Landfill No. 5. A state technical report published in December of 1978 shows that in Delaware water levels rise between November and March and decline from May to September. John H. Talley, *Groundwater Levels in Delaware July, 1966–December 1977*, University of Delaware/Delaware Geological Survey Report of Investigations No. 30, December 1978. B–311–12. Further, water level recordings in this report from Well Qe44–1, ten miles from Landfill No. 5, reflect high groundwater readings in February as compared to other times of the year and the highest groundwater level ever recorded from this well was on February 6, 1973.

Maryland Casualty argues that the County knew that a primary cause of leachate is precipitation percolating down through solid waste and that "the purpose of the daily cover requirement was to minimize the amount of precipitation reaching the waste and thus the amount of harmful leachate which could be generated." *See* Maryland Casualty's Brief in Support of its Motion for Summary Judgment, at 11. As the County advised Hudson on several occasions that it had failed to comply with the daily cover requirements at the landfill, Maryland Casualty contends the County expected that the landfill would discharge leachate. The County has supplied, however, abundant evidence that leachate prevention may not have been the primary purpose of the daily cover requirement. For example, HEW's publication *Sanitary Landfill Facts* describes the purpose of the cover requirement as follows: "The cover is necessary to prevent insect and rodent infestation, blowing paper, fires, the attraction of gulls, and the release of gas and odors." JA–1318. Additionally, the Board of Health officials in charge of enforcing the 1968 Code, Messrs. Stiegler and King, one of the landfill operators, Mr. Hudson, and a County engineer, Mr. McKee, all testified that the purpose of the daily cover requirement was other than preventing leachate migration.

Finally, Maryland Casualty seeks to attribute "common knowledge" to the County regarding the mechanism of leachate generation and discharge from landfills. For example, it argues that New Castle County's discovery in 1972 that its Llangollen Landfill had polluted a nearby well as a result of

leachate migration and the articles in Delaware newspapers relating to this event should have put the County on notice as to the potential for leachate migration from its landfills. Additionally, Maryland Casualty argues that the 1974 Regulations provided further evidence to the County that its landfills would discharge leachate because the Regulations required various engineering measures to prevent leachate migration. Maryland Casualty also asserts that because the County failed to abide by the 1974 Regulations, it expected that the inevitable result would be the discharge of leachate from Landfill No. 5.

The County asserts that at the time the 1974 Regulations were adopted it understood, as Mr. Truitt testified, that there was "no substantiated evidence that leachate contamination of ground or surface waters is occurring in Sussex County." A–1437. The County's belief was confirmed by the 1974 DNREC monitoring results which showed no contamination at Landfill No. 5. The County has also offered evidence to rebut Maryland Casualty's argument that the County knew that without the protective measures required in the 1974 Regulations, the landfill would discharge leachate. For example, Mr. Henry, the former County Engineer testified as follows:

Q: ... unless you put a liner in, you could expect that there was going to eventually be groundwater contamination underlying that landfill caused by leachate from the landfill?
A: We didn't generally expect that there would be leachate, because my understanding of the original procedures was you stayed two feet above, and you capped it with two feet, and you graded it to try and make rainwater run off it instead of going down through and causing leachate....

B–63. Furthermore, Mr. McKee testified that County officials understood the purpose of the new regulations was to "give an added measure of insurance or of protection. It's not saying that existing facilities were contaminating groundwater." JA–435.

Having considered all of the evidence marshalled by Maryland Casualty in support of its contention that the pollution exclusion clause in its 1973–1976 and 1976–1979 policies precludes coverage for the County, the Court finds there remain genuine issues of material fact as to whether the County expected and intended prior to 1980 to discharge leachate from Landfill No. 5. As the County could conceivably prove at trial that the discharge of leachate was unexpected and unintended prior to 1980, it could avoid the operation of Maryland Casualty's pollution exclusion clause by qualifying under the "sudden and accidental" exception to that clause and, therefore, summary judgment on this issue is inappropriate.

### 4. No "occurrence" under the definition of the policies

■ Maryland Casualty's policies obligate the company to pay "on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... property damage to which this insurance applies, caused by an occurrence...." The policies define "occurrence" in relevant part as an accident which results in property damage "neither expected nor intended from the standpoint of the insured."

Maryland Casualty asserts there has been no "occurrence" under the terms of its policies. In support of that argument, it contends the following evidence demonstrates the County expected and intended that environmental damage would result from its operation of the landfill: (1) despite its knowledge that waste contaminates water by direct contact, the County designed Landfill No. 5 to place waste below the high water table level; (2) despite its knowledge that locating a landfill over porous sand might lead to leachate contamination, the County located Landfill No. 5 in an area overlying sand; (3) despite the 1974 Regulations which required a liner and a leachate collection/treatment system in order to prevent groundwater contamination, the County did not undertake to comply with these regulations.

■ In order for the "occurrence" clause to bar coverage for an insured, there must be evidence indicating more than a reasonable foreseeability of a given event; there must be a substantial probability that a loss will occur. *New Castle V*, 933 F.2d at 1191 (quot-

ing *New Castle County v. Hartford Accident and Indem. Co.*, 685 F.Supp. 1321 at 1330 (D.Del.1988) ("New Castle II")). In the context of this case, the relevant inquiry is whether there was a substantial probability at the time the County purchased its policy from Maryland Casualty that off-site environmental damage would result from the County's operation of the landfill. *New Castle III*, 725 F.Supp. at 806–07, 815–16, *aff'd in pertinent part*, 933 F.2d 1162, 1191–92 (3d Cir.1991).

The County asserts that it was not aware of the threat of property damage until late 1984, well after the County purchased its policies from Maryland Casualty, and that it did not learn of off-site property damage until 1989. The County further argues that the occurrence clause requires focusing on the subjective intent of the County and that Maryland Casualty has not met its burden of demonstrating that when the County purchased its policies it knew there was a substantial probability that off-site environmental damage would result from the operation of the landfill. *See New Castle V*, 933 F.2d at 1192.

It was not until 1989 that the County acquired conclusive knowledge that Landfill No. 5 had caused off-site property damage. Although Maryland Casualty asserts that in the 1970's some County employees expected that the landfill would contaminate the groundwater, it has failed to establish conclusively that when the County purchased its policies, it expected that the landfill would cause "property damage" in the form of "off-site pollution." *New Castle V*, 933 F.2d at 1192. Moreover, as the Court has determined that there are genuine issues of fact related to whether prior to 1980 the County expected or intended the landfill to discharge leachate, it follows that there remain genuine issues of fact related to whether the County expected and intended prior to purchasing policies from Maryland Casualty that the operation of the landfill would result in off-site property damage. Accordingly, the Court finds that summary judgment that there was no "occurrence" during the Maryland Casualty policy periods is inappropriate.

## C. Maryland Casualty's Motion for Certification of a Question of Law to the Delaware Supreme Court

On June 14, 1993, Maryland Casualty moved pursuant to Delaware Supreme Court Rule 41 to certify the following question of law to the Delaware Supreme Court:

Under Delaware law, do general liability insurance contracts extend coverage to costs incurred in complying with environmental cleanup regulations, if the costs do not constitute compensation for third-party property damage?

Delaware Supreme Court Rule 41 provides:

(a) **Who May Certify.** Any state court and the United States District Court for the District of Delaware may, on motion or sua sponte, certify to this Court for decision a question of law arising in any case before it prior to the entry of final judgment if there is an important and urgent reason for an immediate determination of such question by this Court and the certifying court has not decided the question in the case.

(b) **Requirements for Accepting a Certification.** Certification will be accepted in the exercise of the discretion of the Court only where there exist important and urgent reasons for an immediate determination by this Court of the questions certified. A certification will not be accepted if facts material to the issue certified are in dispute. A certificate shall state with particularity the important and urgent reasons for an immediate determination by this Court of the question certified. Without limiting the Court's discretion to hear proceedings on certification, the following illustrate reasons for accepting certification:

(i) The question of law is of first instance in this State;

(ii) The reported opinions of the trial courts are conflicting upon the question of law;

(iii) The question of law relates to the constitutionality, construction or application of a statute of this State which has

not been, but should be, settled by the Court.

For the following reasons, the Court will deny the motion. In 1990, Congress enacted the Civil Justice Reform Act ("CJRA") to address the problems of costs and delays in federal district courts. 28 U.S.C. § 471. Delaware has been designated under the CJRA as a Pilot District responsible for developing a program to implement an expense and delay reduction plan that will be reviewed and evaluated in a report the Judicial Conference is to submit to the Committees on the Judiciary of the Senate and House of Representatives no later than December 31, 1995. The CJRA requires that Pilot Districts incorporate six "principles of litigation management" in their expense and delay reduction plans. *See* 28 U.S.C. § 471 note. One of those principles is to set early, firm trial dates and have trials conducted within eighteen months of the filing of the complaint. *See* 28 U.S.C. § 473(a)(2)(B).

Harleysville filed the first complaint in this consolidated matter on March 13, 1992. The trial is currently scheduled for September 27, 1993, sixteen months after the filing of the complaint. It appears that granting Maryland Casualty's motion at this time would require postponing the trial beyond eighteen months from the date of the filing of the complaint which would be contrary to the principles of the CJRA. *See* 28 U.S.C. § 473(a)(2)(B). Consequently, the Court will deny the motion.

## II. *The Insurers Duty to Defend Under Their Policies*

The County and each of the insurers have moved for summary judgment on the issue of whether the insurers are obligated by the terms of their policies to defend the County against the administrative proceeding initiated by the EPA. The County also seeks reimbursement for costs incurred defending against the EPA action. However, the County has not identified specific costs for which it seeks reimbursement.

Each of the policies at issue contains the following clause on the insurers' duty to defend:

[T]he. company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

Under Delaware law, an insurers duty to defend is broader than its duty to indemnify. *Charles E. Brohawn & . Bros., Inc. v. Employers Commercial Union Ins. Co.*, 409 A.2d 1055 (Del.1979); *New Castle I*, 673 F.Supp. 1359 (D.Del.1987). An insurer is required to defend any action which potentially states a claim that is covered under the policy. *Charles E. Brohawn & Bros.*, 409 A.2d at 1055, 1058. The duty to defend is determined by comparing the allegations in the underlying complaint with the terms of the policy. *Continental Casualty Co. v. Alexis I. duPont School Dist.*, 317 A.2d 101, 103 (Del.1974). An insurer can be excused from its duty to defend only if it can be determined as a matter of law that there is no possible legal or factual basis upon which the insurer might eventually be obligated to indemnify the insured. *National Union Fire Ins. Co. v. Rhone–Poulenc Basic Chems. Co.*, Del.Super., C.A. No. 87C–SE–11 (Jan. 16, 1992), at 21, 1992 WL 22690. Therefore, in order to avoid the duty to defend, an insurer must show that the allegations in the underlying complaint are solely and entirely within specific and unambiguous exclusions from coverage. *Id.*

As the insurers duty to defend applies only to "suits" against the insured, the Court must determine as a threshold matter whether the EPA proceeding in this case falls within the meaning of the word "suit" in the policies. The insurers contend that they have no duty to defend the County because the EPA proceeding is not a "suit," while the County asserts that the EPA proceeding is the functional equivalent of a "suit" because the EPA's General and Special Notices con-

fronted it with an immediate adversarial situation.

 The parties have not cited and the Court is not aware of any decision of a Delaware court on the issue of whether a CERCLA potentially responsible party ("PRP") letter from the EPA constitutes a "suit" within the meaning of a CGL policy. Accordingly, the Court must endeavor to predict how the Delaware Supreme Court would rule on this issue. In making this prediction, the Court is guided by the following principles for interpreting insurance contracts under Delaware law. In Delaware, an insurance policy is a contract of adhesion and as a general rule ambiguous language is construed strongly against the insurer, and in favor of the insured, because the insurer drafted the language that is interpreted. *Hallowell v. State Farm Mut. Auto. Ins. Co.,* 443 A.2d 925, 926 (Del.1982). However, if the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them. *Apotas v. Allstate Ins. Co.,* 246 A.2d 923, 925 (Del.1968). An ambiguity exists when the language in a contract permits two or more reasonable interpretations. *Cheseroni v. Nationwide Mut. Ins. Co.,* 402 A.2d 1215, 1217 (1979), *aff'd* 410 A.2d 1015 (Del.1980); *Hallowell,* 443 A.2d at 926.

The Court begins with an examination of the relevant language in the policy which reads as follows: "the company shall have the right and duty to defend any *suit* against the Insured. . . ." (emphasis added). Several courts have found that the meaning of the word "suit" in the above quoted policy language is unambiguous. For example, in *Detrex Chem. Indus. Inc. v. Employers Ins. of Wausau,* 681 F.Supp. 438, 446 (N.D.Ohio 1987), *modified in part,* Env't Rep.Cas. (BNA) 1502 (N.D.Ohio 1988), *reconsideration denied,* 746 F.Supp. 1310 (N.D.Ohio 1990), the court found that "merely because the PRP letters to [the insured] informed it that it might be liable for cleanup costs, penalties and punitive damages under CERCLA does not mean that these letters meet the attributes of a 'suit'." Similarly, in *Ray Indus. Inc. v. Liberty Mut. Ins. Co.,* 974 F.2d 754, 761 (6th Cir.1992), the court examined conventional and legal dictionaries and concluded that the plain meaning of the word "suit" requires an attempt to gain an object *in the courts.*

Other courts have found that the word "suit" is ambiguous. In determining whether a PRP letter from the EPA constitutes a "suit" these courts have focused on whether the letter is sufficiently coercive and adversarial so as to be the functional equivalent of a "suit," thereby triggering the duty to defend. *Compare Hazen Paper Co. v. United States Fidelity & Guar. Co.,* 407 Mass. 689, 555 N.E.2d 576, 581 (Mass.1990) ("The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately.") *with Technicon Elecs. Corp. v. American Home Assur. Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91, (2d Dept.1988) *aff'd on other grounds,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989) (PRP letter from the EPA is an invitation to voluntary action and is not the equivalent of the commencement of a formal proceeding).

Having reviewed the case law on whether a PRP letter from the EPA constitutes a "suit" within the meaning of a CGL policy, and having considered this case law in the context of the principles of insurance contract construction as applied by Delaware courts, the Court finds for the following reasons that the PRP letters sent to the County by the EPA do not constitute a "suit" and, therefore, the insurers do not have a duty to defend the County against the CERCLA proceeding brought by the EPA to investigate and control the release or threatened release of hazardous substances, pollutants, or contaminants at Landfill No. 5.

First, Delaware courts should not destroy or twist the meaning of words under the guise of construing them. *Apotas,* 246 A.2d at 925. In light of this principle, the Court agrees with the decision in *Ray Industries* where the court found no ambiguity in the word "suit" and concluded that it could not construe the EPA's threat to hold the insured liable for clean up costs as a suit without doing violence to the plain and ordinary meaning of the word. *Ray Industries,*

974 F.2d at 761. *See also Technicon,* 533 N.Y.S.2d at 104:

> The EPA letter at issue merely informed [the insured] of its potential liability under CERCLA and that the EPA was interested in discussing [the insured's] voluntary participation in remedial measures. The letter was an invitation to voluntary action on [the insured's] part and is not the equivalent of the commencement of a formal proceeding within the meaning of the subject comprehensive general liability policies.

The Court is mindful of the serious nature of the letters from the EPA advising the County of its potential CERCLA liability. However, the insurance policies at issue in this case limit the insurers duty to defend to "suits" and the Court will not deprive the insurers of the benefit of their bargain by forcing them to defend against an administrative proceeding, no matter how serious the consequences of that proceeding might be to the insured.

Second, the Court finds that recognizing the distinction between a "suit" and other agency action taken against an insured follows the options available to the EPA under CERCLA. Pursuant to Sections 104, 106 and 107 of CERCLA, 42 U.S.C. §§ 9604, 9606 and 9607, the EPA can file a lawsuit against a PRP as it did in the *New Castle* and *Rhone–Poulenc* cases, or it can contact the PRP and try to secure its voluntary cooperation as it did in this case. Recognizing the difference in these approaches provides a clear line of demarcation between situations that do and do not trigger the insurer's duty to defend. Kenneth S. Abraham, *Environmental Liability Insurance Law* 265 (1991).

The Court also recognizes that a fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. *Interim Guidance on Notice Letters, Negotiations, and Information Exchange,* EPA Memorandum, 53 Fed.Reg. 5298 (1988). At least one court has noted that this goal could be subverted if PRP letters do not trigger an insurer's duty to defend under CGL policies as insureds "might be inhibited from cooperation with the EPA in order to invite the filing of a formal complaint," which would trigger

the insurer's duty to defend. *See Aetna Cas. and Sur. Co., Inc. v. Pintlar Corp.,* 948 F.2d 1507, 1517 (9th Cir.1991). The same court recognized, however, that lack of cooperation with the EPA may expose the insured, and potentially its insurers, to much greater liability including punitive damages and the EPA's litigation costs. *Id.* at 1517. In light of these incentives for cooperation, the Court finds it unlikely that an insured will refuse to cooperate with the EPA in order to force the EPA to file a suit, thereby triggering the insurer's duty to defend. Furthermore, in holding that the CERCLA proceeding initiated by the EPA in this case does not constitute a "suit" within the meaning of the CGL policies, the Court in no way intends to discourage insureds and insurers from communicating on how best to respond to actions initiated by the EPA under CERCLA. Although an insurer may not be *obligated* to defend the insured at this stage of a CERCLA proceeding, it appears the insured has an obligation to give notice to the insurer of a CERCLA action initiated by the EPA, and the insurer may well have an interest in providing a defense early in the administrative proceeding as it may ultimately be called upon to indemnify the insured for liability resulting from that proceeding.

The Court will enter an Order in accordance with this Opinion.